**Sofyan Ali SALEH, Petitioner,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Immigration and Naturalization Service, Respondents.**

No. 251, Docket 91–4041.

United States Court of Appeals, Second Circuit.

Argued Sept. 16, 1991.

Decided April 29, 1992.

Paul I. Freedman, New York City, for petitioner.

Timothy MacFall, Special Asst. U.S. Atty., S.D.N.Y., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Diogenes P. Kekatos, Thomas A. Zaccaro, Asst. U.S. Attys., S.D.N.Y., New York City, of counsel), for respondents.

Before: MESKILL, PIERCE, and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Sofyan Ali Saleh petitions for review of an order of the Board of Immigration Appeals ("BIA") dated September 27, 1990 that dismissed an appeal from a decision of Immigration Judge ("IJ") Patricia A. Rohan dated June 5, 1990. The IJ's decision denied Saleh's applications for asylum pursuant to 8 U.S.C. § 1158(a) (1988),[1] with-

1. Section 1158(a) provides:

The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

Section 1101(a)(42)(A) provides in pertinent part:

The term "refugee" means (A) any person who is outside any country of such person's nationality ..., and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....

holding of deportation to the Yemen Arab Republic pursuant to 8 U.S.C. § 1253(h) (1988 & Supp. II 1990),[2] and a waiver of excludability pursuant to 8 U.S.C. § 1182(c) (1988 & Supp. II 1990).[3]

Saleh claims that the BIA and IJ erred in concluding that he had failed to meet the statutory requirements for asylum and withholding of deportation. Saleh contends that because he is under a death sentence imposed by an Islamic court in Yemen for a homicide which he committed in the United States that has already resulted in his imprisonment here, he has established a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" within the meaning of 8 U.S.C. § 1101(a)(42) (1988), and thus qualifies for asylum and withholding of deportation. He also seeks a discretionary waiver of excludability.

Agreeing with the BIA and IJ that Saleh's claims are not supported by the applicable law, we deny his petition for review.

## Background

Saleh, a Yemeni citizen, became a permanent resident alien through marriage to a U.S. citizen in 1982. On February 4, 1983, while living in New York City, he shot and killed Abdulla Elhosheshi, another Yemeni national. Saleh pled guilty to first degree manslaughter and commenced serving a sentence of 8⅓ to 25 years. Based on the same occurrence, Saleh was also tried and convicted *in absentia* in Yemen and sentenced to death by a "Sharia" (Islamic) court. Jurisdiction existed because Saleh and the victim were both Yemeni Moslems.

On January 12, 1989, the Immigration and Naturalization Service ("INS") issued an order to show cause and notice of hearing to seek Saleh's deportation pursuant to 8 U.S.C. § 1251(a)(4) (1988)[4] because he had been "convicted of a crime involving moral turpitude committed within five years after entry and ... confined therefore in a prison or corrective institution, for a year or more...." *Id.* The deportation hearing commenced on May 11, 1989, and was adjourned at Saleh's request to allow him to apply for asylum, withholding of deportation, and waiver of excludability.

On May 22, 1989, Saleh filed applications for: (1) asylum in the United States pursuant to § 1158(a); (2) withholding of depor-

**2.** Section 1253(h) provides in pertinent part:

(1) The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

(2) Paragraph (1) shall not apply to any alien if the Attorney General determines that—

\* \* \* \* \* \*

(B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States[.]

\* \* \* \* \* \*

For purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime.

**3.** Section 1182(c) provides in pertinent part:

Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful

unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of subsection (a) of this section [defining "excludable aliens"].... The first sentence of this subsection shall not apply to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years.

Although this provision applies, by its terms, only to aliens who temporarily proceed abroad voluntarily and thereafter seek to return to a lawful unrelinquished domicile of seven consecutive years, discretionary relief thereunder is also available, because constitutionally required, to otherwise similarly situated aliens, like Saleh, who do not temporarily absent themselves from the United States. *See Francis v. INS*, 532 F.2d 268, 269 (2d Cir.1976).

**4.** This provision has been recodified without substantial change as 8 U.S.C. § 1251(a)(2)(A)(i), effective as to deportation proceedings for which notice is provided to the alien on or after March 1, 1991. *See Immigration Act of 1990*, Pub.L. No. 101-649, § 602(a) and (d), 104 Stat. 4978, 5079, 5082 (1990).

tation to Yemen pursuant to § 1253(h); [5] and (3) a discretionary waiver of excludability pursuant to § 1182(c). The IJ referred Saleh's application for asylum to the State Department's Bureau of Human Rights and Humanitarian Affairs ("BHRHA") for its assessment of Saleh's claims. *See* 8 C.F.R. §§ 236.3(b), 242.17(c)(3) (1991). The BHRHA responded by letter dated June 9, 1989 stating its opinion that, assuming the existence of the reported Sharia court judgment, Saleh had "not established a well-founded fear of persecution upon return to" Yemen on any of the statutorily recognized grounds.

The deportation hearing resumed on September 14, 1989. Saleh was represented by counsel. At the outset, Saleh designated England as the country for deportation (in the event his several applications were denied), and the government designated Yemen "as an alternate." The IJ noted that an Arabic interpreter had been requested and would be available if necessary, but that the hearing would initially proceed without an interpreter because Saleh's counsel had advised the IJ that Saleh spoke English "fluently." Saleh also represented that he spoke English, and testified at length throughout the hearing, responding to questions put to him in English.

Saleh testified that he had shot Elhosheshi because of a verbal provocation, and that he feared for his life if he returned to Yemen. He submitted a memorandum of law arguing that his Yemeni conviction entitled him to asylum. He argued that he was being persecuted on account of his religion—because he would be punished in Yemen under the "fanatical interpretation of age old [religious] laws and customs," and that he was being persecuted because of his membership in a particular social group—Yemeni Moslems residing outside of Yemen, "upon whom the Islamic authorities in Yemen are attempting to exert their power and control."

The IJ requested that the BHRHA investigate the status of Saleh's Yemeni conviction. By letter dated March 26, 1990, the

BHRHA responded that the conviction had not yet been reviewed by the provincial appellate court or the High Court of Sanaa in Yemen. The appellate courts, however, would not review the sentence, but only the facts of the case, i.e., whether Saleh intentionally caused the death of Elhosheshi. If the death sentence were affirmed, it could be waived by the Yemeni President on recommendation of the Presidential Office of Appeals. Also, under Islamic law, the victim's family could waive the death sentence by electing to receive "blood money" from Saleh in lieu of his execution. In this case, the amount of "blood money" could range from $186,000 to $360,000.

On June 5, 1990, the IJ rendered a decision that denied Saleh's applications and ordered his deportation. The IJ concluded that Saleh's conviction in Yemen did not constitute statutory "persecution" because Saleh had simply been " 'prosecut[ed] for a common law offense' " (quoting United Nations *Handbook on Procedures and Criteria for Determining Refugee Status*, ch. II, ¶ 56 (1979)), i.e., murder or manslaughter. The IJ noted in this regard that Saleh had made no showing that: (1) he would be punished for his crime in a discriminatory fashion, (2) the Yemeni punishment that he faced was arbitrary or excessive, or (3) the Yemeni court lacked jurisdiction to punish him on double jeopardy or other grounds.

The IJ further ruled that even assuming persecution, it would not have been premised upon either religion or membership in a particular social group, the statutory grounds invoked by Saleh. As to religion, the judge noted that although Saleh was prosecuted in an Islamic court, a death sentence for intentional killing of a human being is common in many secular courts. As to membership in a particular social group, the IJ explained that expatriate Yemeni Moslems do not manifest the sort of "common, immutable characteristic" that is required to satisfy this criterion.

Saleh was thus deemed not entitled to asylum under § 1158(a) or withholding of deportation under § 1253(h). The IJ addi-

---

5. 8 C.F.R. § 208.3(b) (1991) provides that "[a]n application for asylum shall be deemed to constitute at the same time an application for withholding of deportation."

tionally concluded that Saleh was disqualified from withholding of deportation under § 1253(h)(2)(B) because he had been convicted of a "particularly serious crime" within the meaning of that provision. Finally, the judge denied Saleh's application for discretionary waiver of excludability under § 1182(c) because his serious criminal conviction outweighed any positive factors in his favor.

Saleh appealed to the BIA. In addition to the arguments he had previously advanced, Saleh contended that he was being persecuted on account of his membership in the "particular social group" of poor Yemenis who could not afford to pay "blood money" to buy their way out of a death sentence. The BIA found no persecution on this basis because the "blood money" payment was facially neutral, was discretionary with the victim's family, and a presidential waiver was possible regardless of wealth. The BIA dismissed Saleh's appeal on September 27, 1990, and Saleh timely petitioned this court to review the BIA's order of dismissal.

Saleh was granted parole from state prison in May 1991, and was released into the custody of the INS.

## Discussion

The government contends on appeal that Saleh has conceded deportability, and does not appeal from the denial of his application for a discretionary waiver of excludability pursuant to § 1182(c). In any event, deportability is beyond question, *see supra* text accompanying note 4, and a 1990 amendment to § 1182(c) precludes the ap-

plication of that provision to this case.[6] Accordingly, the issues presented on appeal are Saleh's claims to asylum pursuant to § 1158(a) and to withholding of deportation pursuant to § 1253(h), and his further contention that his counsel in the immigration proceedings was ineffective.

■■■ An alien seeking political asylum or withholding of deportation bears the burden of establishing eligibility. 8 C.F.R. §§ 208.13(a), 208.16(b) (1991). On appeal, "findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive." 8 U.S.C. § 1105a(a)(4) (1988); *see Maikovskis v. INS*, 773 F.2d 435, 446 (2d Cir.1985), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986). Thus, the factual findings regarding Saleh's eligibility for asylum or withholding of deportation must be upheld if they are supported by substantial evidence. *See Melendez v. United States Dep't of Justice*, 926 F.2d 211, 216–18 (2d Cir.1991). The ultimate denial of asylum in applications brought pursuant to § 1158(a) is reviewed for abuse of discretion, because the § 1158(a) decision is discretionary. *Id.* at 218; *see supra* note 1. The ultimate denial of withholding of deportation pursuant to § 1253(h), on the other hand, is reviewed by the substantial evidence standard, because the § 1253(h) decision is not discretionary. *Id.; see supra* note 2.

### A. *Request for Asylum.*[7]

Under § 1158(a), political asylum may discretionarily be granted to aliens who

6. Section 1182(c) was amended by the Immigration Act of 1990, Pub.L. No. 101–649, § 511(a), 104 Stat. 4978, 5052 (1990), to bar the benefits of § 1182(c) to "an alien who has been convicted of an aggravated felony and has served a term of imprisonment of at least 5 years." *See supra* note 3. Saleh was convicted of an aggravated felony, *see* 8 U.S.C. § 1101(a)(43) (1988 & Supp. II 1990) (defining "aggravated felony" to include "any crime of violence (as defined in section 16 of title 18, not including a purely political offense) for which the term of imprisonment imposed (regardless of any suspension for such imprisonment) is at least 5 years"), and was as a result imprisoned for more than five years. The 1990 amendment of § 1182(c) applies "to admissions occurring after the date of

the enactment of this Act." Immigration Act of 1990 § 511(b). Accordingly, Saleh may not now be admitted pursuant to § 1182(c).

7. Under current law, Saleh would not be eligible for asylum pursuant to § 1158(a). 8 U.S.C. § 1158(d) (Supp. II 1990), which became law in 1990, provides that "[a]n alien who has been convicted of an aggravated felony, notwithstanding subsection (a) of this section, may not apply for or be granted asylum." *See* Immigration Act of 1990, Pub.L. No. 101–649, § 515(a), 104 Stat. 4978, 5053 (1990). Saleh has been convicted of an aggravated felony. *See supra* note 6. Section 1158(d) applies, however, only to applications for asylum made on or after the

qualify as refugees within the meaning of § 1101(a)(42)(A). In order to satisfy § 1101(a)(42)(A), Saleh must establish "persecution or a well-founded fear of persecution [in Yemen] on account of race, religion, nationality, membership in a particular social group, or political opinion." *See supra* note 1.

██ An applicant for asylum must show that his fear of persecution is well-founded. Well-founded fear involves both a subjective and an objective component. The applicant must show he has a subjective fear of persecution, and that the fear is grounded in objective facts. *See Gomez v. INS*, 947 F.2d 660, 663 (2d Cir.1991); *Melendez*, 926 F.2d at 215; *Carcamo–Flores v. INS*, 805 F.2d 60, 64 (2d Cir.1986). In addition, the applicant must show that the fear is based on one of the grounds specified for asylum. *Gomez*, 947 F.2d at 663 ("Essentially, the alien must produce some evidence connecting his or her subjective fear to his or her membership in one of the five enumerated categories.").

██ Saleh has demonstrated a well-founded fear of returning to Yemen, and his fear is supported by the objective facts of his conviction and sentence. Saleh has not established, however, a well-founded fear of "persecution," as required by § 1101(a)(42)(A). Rather, his prosecution in Yemen reflects the nondiscriminatory application of Yemeni criminal law to his intentional killing of a fellow Yemeni Moslem.

Punishment for violation of a generally applicable criminal law is not persecution. *See MacCaud v. INS*, 500 F.2d 355, 359 (2d Cir.1974); *Sovich v. Esperdy*, 319 F.2d 21, 28 (2d Cir.1963); *see also* United Nations *Handbook on Procedures and Criteria for Determining Refugee Status*, ch. II, ¶ 56 (1979) ("Persecution must be distinguished from punishment for a common law offense.... It should be recalled that a refugee is a victim—or potential victim—of injustice, not a fugitive from justice."). Saleh has failed to establish that he was

improperly singled out for punishment under Yemeni law. Rather, he was subjected to a sentence that is imposed upon all Yemeni Moslems convicted in Yemeni Sharia courts of unjustifiable homicide of another Yemeni Moslem.

Furthermore, even assuming the existence of statutory "persecution," Saleh must establish that it occurred "on account of [his] race, religion, nationality, membership in a particular social group, or political opinion" within the meaning of § 1101(a)(42)(A). Saleh maintains that his Yemeni conviction and death sentence constitute persecution based upon both religion and membership in a particular social group.

Saleh contends that because the Sharia court would not have jurisdiction if either he or his victim were not Yemeni Moslems, his death sentence amounts to religious persecution. Admittedly, the Yemeni dispensation is foreign to American laws and mores under the regime of the First Amendment. In our view, however, § 1101(a)(42)(A) does not call upon this court to substitute domestic standards for those enforced under Yemeni law nondiscriminatorily in accordance with the Moslem religion.

The Islamic law is equally applicable to all Yemeni Moslems, the majority of the population. We do not believe that persecution "on account of religion" results because an alien is deported to a country that takes religion into account in the provisions of its domestic criminal law, and is likely to apply that law to the alien (a native of that country and adherent of the religion in question) in a nondiscriminatory manner, imposing a punishment that would be inflicted in many secular jurisdictions. *Cf. INS v. Elias–Zacarias*, —— U.S. ——, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992) (generalized "political" motive for forced recruitment by guerrillas does not result in "persecution [of potential forced recruit] *on account of* political opinion, as § [1101](a)(42) requires").

date of the enactment of the Immigration Act of 1990, *see id.* § 515(b), which was November 29, 1990. *See* statement by President George Bush

upon signing S. 358, 1990 U.S.C.C.A.N. 6801–1—6801–2. Saleh applied for asylum on May 22, 1989.

■ Saleh also alleges persecution based upon membership in a "particular social group." Before the IJ, he defined the social group as Yemeni Moslems living abroad. Upon appeal to the BIA, Saleh defined the applicable social group as poor Yemeni Moslems who were discriminated against because they could not avoid execution by paying "blood money" to the victim's family (assuming a disposition by the family to accept "blood money" in lieu of a death sentence).

Saleh is not a member of a "particular social group" as that phrase has been interpreted in the case law. This term "encompass[es] 'a collection of people closely affiliated with each other, who are actuated by some common impulse or interest.'" *Gomez*, 947 F.2d at 664 (quoting *Sanchez–Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir.1986)). Members of a social group must be distinguishable. "Like the traits which distinguish the other four enumerated categories—race, religion, nationality and political opinion—the attributes of a particular social group must be recognizable and discrete." *Gomez*, 947 F.2d at 664.

The class of Yemeni Moslems living abroad does not possess such recognizable and discrete attributes; nor does the class of poor Yemeni Moslems. Instead, both groups possess broadly-based characteristics similar to "youth and gender" that we held insufficient to identify a particular social group in *Gomez*. *See* 947 F.2d at 664. Thus, neither expatriate Yemeni Moslems nor poor Yemeni Moslems possess the necessary characteristics to qualify as a "particular social group" within the meaning of § 1101(a)(42)(A).

In addition, the Islamic law under which Saleh was convicted is not directed at either expatriate or poor Yemeni Moslems. Rather, it is directed at the group of people guilty of "unjustifiable homicide" over which the Islamic court has jurisdiction. There is no evidence that the Yemeni government is persecuting either Moslems living abroad or its poor Moslem citizens. Accordingly, Saleh has failed to establish membership in a statutory "particular social group."

## B. *Withholding of Deportation.*

■ Section 1253(h)(1) mandates, without providing for any exercise of discretion, that the Attorney General withhold deportation of an alien to a country where the Attorney General determines that the alien's "life or freedom would be threatened ... on account of race, religion, nationality, membership in a particular social group, or political opinion." Although these categories parallel those warranting asylum, *see supra* note 1, the standard for withholding of deportation ("would be threatened," § 1253(h)(1)) is higher than that for asylum ("well-founded fear of persecution," § 1101(a)(42)(A)). *INS v. Cardoza–Fonseca*, 480 U.S. 421, 430–32, 107 S.Ct. 1207, 1212–13, 94 L.Ed.2d 434 (1987). Accordingly, the applicant must establish a "clear probability" that he will be persecuted in the particular country because of one of the statutorily specified grounds. *INS v. Stevic*, 467 U.S. 407, 413, 104 S.Ct. 2489, 2492, 81 L.Ed.2d 321 (1984); *Melendez*, 926 F.2d at 215.

■ Because the standard for withholding of deportation is more stringent than that for asylum, and the grounds specified in §§ 1101(a)(42)(A) and 1253(h)(1) are identical, an alien who cannot establish eligibility for asylum cannot obtain withholding of deportation. *See Gomez*, 947 F.2d at 665 (citing *Cardoza–Fonseca*, 480 U.S. at 443–44, 107 S.Ct. at 1219–20). Accordingly, our conclusion that Saleh is not eligible for asylum establishes *a fortiori* that his deportation may not be withheld.

■ We note also that § 1253(h)(2)(B) authorizes the Attorney General to determine that an alien who has been convicted by a final judgment of a particularly serious crime constitutes a danger to the community of the United States, in which event deportation may not be withheld pursuant to § 1253(h)(1). *See supra* note 2. Further, a 1990 amendment to § 1253(h)(2) specifies that "[f]or purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered

to have committed a particularly serious crime." *See* Immigration Act of 1990, Pub.L. No. 101–649, § 515(a)(2), 104 Stat. 4978, 5053 (1990). Saleh has been convicted of an aggravated felony, *see supra* note 6, and the 1990 amendment applies "to convictions entered before, on, or after the date of the enactment of [the Immigration Act of 1990]." *Id.* § 515(b)(2), as amended by the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub.L. No. 102–232, § 306(a)(13), 105 Stat. 1733, 1752 (1991).

### C. *Ineffective Assistance of Counsel.*

■ Saleh argues that he was deprived of effective assistance of counsel because his former attorneys failed to consult with him before the deportation hearing, and to request an interpreter at the hearing.

A deportation hearing is a civil, not criminal, proceeding. *See INS v. Lopez–Mendoza,* 468 U.S. 1032, 1038–39, 104 S.Ct. 3479, 3483–84, 82 L.Ed.2d 778 (1984). Thus, in order to prevail on an ineffectiveness claim, an alien must show that his counsel's performance was " 'so ineffective as to have impinged upon the fundamental fairness of the hearing in violation of the fifth amendment due process clause.' " *Ramirez–Durazo v. INS,* 794 F.2d 491, 500 (9th Cir. 1986) (quoting *Magallanes–Damian v. INS,* 783 F.2d 931, 933 (9th Cir.1986)).

Saleh has made no showing of a lack of fundamental fairness. His former attorneys obtained an adjournment of his initial deportation hearing in order to file for asylum, withholding of deportation, and a waiver of excludability. Saleh was competently questioned at the resumed hearing, and his counsel sought a continuance to present further evidence regarding the posture of Saleh's prosecution in Yemen. Further, competent briefs were submitted in his behalf.

As to the interpreter issue, at both the May 11, 1989 deportation hearing and its continuation on September 14, 1989 the IJ asked Saleh whether he spoke English, and Saleh answered affirmatively. Further, the IJ had an Arab interpreter present throughout the September 14th hearing in case such assistance was needed, and the IJ made this known to Saleh. Finally, Saleh testified extensively in English at that hearing in response to questions posed to him in English.

In sum, Saleh has not demonstrated either incompetent performance by his attorneys or resultant prejudice to his case. *See Ramirez–Durazo,* 794 F.2d at 500. His claim of ineffective assistance of counsel must therefore be rejected.

### Conclusion

The petition for review is denied. We note, however, that in *Linnas v. INS,* 790 F.2d 1024 (2d Cir.), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986), this court stated "that there could arise a situation in which the person to be removed from the United States would be subjected to 'procedures or punishment so antipathetic to a federal court's sense of decency' as to require judicial intervention." *Id.* at 1032 (quoting *Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir.), *cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960)). Although we conclude herein that Saleh's claims on appeal are without merit, this ruling does not foreclose the possibility, under appropriate circumstances, of judicial intervention into such matters.