Lulseged DHINE, Petitioner,

v.

DISTRICT DIRECTOR and Immigration and Naturalization Service, Respondents.

No. 92 Civ. 2026 (CSH).

United States District Court,
S.D. New York.

April 22, 1993.

---

Fried, Frank, Harris, Shriver & Jacobson, Washington, DC (Douglas W. Baruch, of counsel), for petitioner.

Roger S. Hayes, U.S. Atty., New York City (James A. O'Brien, III, Sp. Asst. U.S. Atty., of counsel), for respondents.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Petitioner in this case seeks a writ of habeas corpus pursuant to 8 U.S.C. § 1105a(a)(10) against the Immigration and Naturalization Service ("INS") and the local District Director. He claims that he has been improperly placed in exclusion proceedings, and that the immigration judge and the Board of Immigration Appeals ("BIA") wrongly denied his applications for asylum and withholding of deportation.

## BACKGROUND

The following factual account, based primarily on Dhine's testimony before the immigration judge, is not disputed by the INS.

Petitioner Lulseged Dhine is an Ethiopian Jew, a member of a very small community which the Ethiopians have termed "Falasha", or the "strange ones".

Dhine was born and raised in a village in the Gondar province of Ethiopia, where he lived with his parents, an older brother and three sisters. Dhine's father was a leader of the local community of Jews.

Dhine attended a private religious school, rather than the local public school where Jews did not feel welcome. Dhine faced other restrictions on practicing his religion. He testified that he did not use his religious name (Yosef Abraham) in public because of his fear of persecution, and if he wore a yarmulke, he was forced to cover it with a turban.

The rise of the Mengistu government signalled an increase in the persecution against Jews in Ethiopia. Jewish religious schools were closed and religious materials were confiscated. When villagers refused to surrender their religious materials in exchange for books containing the writings of Chairman Mao, they were often taken away and never seen again.

Dhine personally engaged in protests against the closing of religious schools and the burning of religious materials. Those demonstrations often ended when soldiers on jeeps began spraying machine gun fire into the crowds.

The events which led to petitioner's leaving Ethiopia occurred in or about June 1978, when Mengistu loyalists approached Dhine's father. The loyalists demanded that Dhine's father turn over his land and his religious materials, and accept books that contained the teachings of Chairman Mao. Dhine's father refused. The loyalists then summarily executed Dhine's parents and older brother. When Dhine returned from school where he had been that day, neighbors informed him of what had happened. Fearing for his own safety, Dhine fled the village.

Attempting to reach a neighboring village where some of his cousins lived, Dhine was arrested and held for one week. During this time Dhine was beaten and tortured. He was told upon his release that if he was ever seen in the area again, he would be killed.

Banding together with other Ethiopian Jews, Dhine traveled to the Sudan. In the Sudan, however, he was subject to further persecution because he was a Jew, and he left for Djibouti. There, he contacted the United Nations and initiated the process of classifying himself as a refugee. After a brief stop in Paris, Dhine was admitted to the United States on November 27, 1978 as a conditional entrant refugee pursuant to Section 203(a)(7) of the Immigration and Naturalization Act of 1952 (the "Act"), 8 U.S.C. § 1153(a)(7).

On October 5, 1988, the INS initiated proceedings by Order to Show Cause to deport Dhine. Deportation was sought because Dhine had accrued a number of criminal convictions since entering the United States. Specifically, Dhine was convicted seven times in the District of Columbia between 1982 and 1990: possession of marijuana (1982); receiving stolen property (1983); attempted distribution of marijuana (1988); attempted possession of cocaine (1988); two separate

counts of failure to appear (1988, 1989); and possession of cocaine (1990). The Court notes that four of these offenses were drug offenses, one of which involved attempted distribution (of marijuana). Under District of Columbia law, all of these offenses were considered misdemeanors.

The initial Order to Show Cause was superseded in 1989, adding the post–1988 convictions. In September 1990, however, an immigration judge ruled that Dhine was improperly in deportation proceedings as he had never formally entered the country; the INS immediately initiated exclusion proceedings.

On May 22, 1990, as those proceedings were going on, petitioner filed an application for political asylum pursuant to section 208(a) of the Act, 8 U.S.C. § 1158(a), and an application for the withholding of deportation, pursuant to section 243(h) of the Act, 8 U.S.C. § 1253(h).

After extensive proceedings before an immigration judge and the BIA, Dhine was found excludable, and his applications for political asylum and withholding of deportation were denied. A final order of deportation has been issued. Dhine has been held in the custody of the INS since June 1990. He files this writ of habeas corpus alleging errors in the proceedings below.

Essentially, Dhine alleges three significant errors: (1) that he was improperly in exclusion proceedings, as he had entered the country and was entitled to the procedural protections available in deportation hearings; (2) that he was improperly denied political asylum; and (3) that he was improperly denied withholding of deportation.

## DISCUSSION

I. *Appropriateness of Exclusion Proceedings*

In September 1990, the INS revoked Dhine's conditional entrant status and placed him in exclusion proceedings under section 236 of the Act, 8 U.S.C. § 1226, on the grounds that his narcotics convictions rendered him excludable pursuant to section 212(a)(23) of the Act, 8 U.S.C. § 1182(a)(23). That section provides for the exclusion of aliens convicted of violating the narcotics laws.

Dhine argues that he is not subject to exclusion because he has "entered" the country. He contends that the INS must initiate deportation proceedings if it wants to remove him.

■ The distinction between exclusion and deportation turns on whether an individual has "entered" the country: aliens who have entered the country are subject to deportation rather than exclusion. Individuals in deportation proceedings have due process rights superior to those in exclusion proceedings. *See Landon v. Plascencia*, 459 U.S. 21, 26, 103 S.Ct. 321, 325, 74 L.Ed.2d 21 (1982). The appropriateness of the exclusion proceedings thus turns on whether Dhine can be deemed to have entered the country.

■ A determination of entry does not hinge on physical presence or the crossing of a national border; what is critical is the manner in which the alien arrived in this country. Aliens who are stopped at a border point are deemed to have not entered, even if they are later paroled into the country. *See Kaplan v. Tod*, 267 U.S. 228, 45 S.Ct. 257, 69 L.Ed. 585 (1925) (alien did not enter the United States despite nine years residence because she had been paroled into the country). By contrast, aliens physically present in the country without any authority are deemed to have "entered". *See Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958).

■ The INS asserts that because Dhine was a conditional entrant who was never inspected for admissibility pursuant to section 203(g) of the Act, 8 U.S.C. § 1153(g), he never "entered" the country, and thus was properly excludable.

Dhine argues that to find that he never entered is to carry a legal fiction ("entry") to a ludicrous extreme. He notes that he has lived and worked and traveled freely about the country for more than ten years. He argues that it is absurd to equate his position with that of an alien who is detained at a border checkpoint.

Dhine's argument fails because "entry" is not determined by physical presence. Conditional entry in this context is analogous to parole: both permit the alien access into the country, but that access may be summarily terminated if the INS makes an adverse decision on the alien's admissibility. Both allow the alien the benefits of relative freedom rather than waiting in INS custody pending that determination. Yet an alien paroled into the country is not deemed to have entered for the purposes relevant here. That is the holding of *Kaplan v. Tod.* No persuasive reason is advanced for applying a different rule to conditional entries.

Despite the fact that Dhine lived and worked in this country for a long time, he never completed his application for admission into this country; his status was never changed from that of conditional entrant. Accordingly, he remained a conditional entrant, subject to exclusion if he was deemed inadmissible for any reason.

■ Dhine next argues that his status as a conditional entrant was adjusted to that of permanent resident approximately two years after he arrived in this country. Dhine relies on section 203(g) of the Act, 8 U.S.C. § 1153(g), which provides:

Any alien who conditionally entered the United States as a refugee, pursuant to subsection (a)(7) of this section, whose conditional entry has not been terminated by the Attorney General pursuant to such regulations as he may prescribe, who has been in the United States for at least two years, and who has not acquired permanent residence, shall forthwith return or be returned to the custody of the Immigration and Naturalization Service and shall thereupon be inspected and examined for admission into the United States ...

*See also* 8 C.F.R. 235.9(a).

Dhine does not contend that he was ever inspected and deemed admissible pursuant to this section; he concedes that he never presented himself and demanded to be inspected for admissibility. He notes, however, that he appeared before the INS a number of times between 1980 and 1986 to get travel documents updated and confirm his status. He contends that the INS' failure to inspect him on these occasions automatically rendered him a permanent resident, retroactive to the date of his entry. *See* section 203(h) of the Act, 8 U.S.C. § 1153(h).

The INS responds that Dhine's argument is nothing more than an assertion of estoppel, which is difficult to establish against the government, particularly in the absence of affirmative misconduct. *See Schweiker v. Hansen,* 450 U.S. 785, 788–90, 101 S.Ct. 1468, 1470–72, 67 L.Ed.2d 685 (1981); *Montana v. Kennedy,* 366 U.S. 308, 314–15, 81 S.Ct. 1336, 1340–41, 6 L.Ed.2d 313 (1961); *Long Island Radio Co. v. NLRB,* 841 F.2d 474, 478 (2d Cir.1987). Moreover, a holding that the INS' failure to make the necessary inspection afforded Dhine special benefits, would impose a burden on the agency not contemplated by the regulations. While I note that if the INS had inspected Dhine in a timely fashion, he would likely be a permanent resident today, I believe the INS has the better of this argument. Absent any inspection, Dhine retained whatever status he held when he arrived, which was that of conditional entrant.

Since Dhine never "entered" this country for the purposes relevant to this discussion, he properly belongs in exclusion proceedings.

## II. *Application for Asylum*

On May 22, 1990, Dhine filed an application for asylum pursuant to section 208(a) of the Act, 8 U.S.C. § 1158(a). That provision provides the Attorney General with the discretion to grant asylum to any alien who establishes that he is a refugee within the meaning of 8 U.S.C. § 1101(a)(42). A refugee is defined as one who cannot return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion." 8 U.S.C. § 1101(a)(42).

■ Thus, obtaining asylum is a two-step process: an alien must prove that he is statutorily eligible (that he has a well-founded fear of persecution), and that he should be granted asylum as a discretionary matter. A district court reviewing a denial of asylum applies the substantial evidence standard to the finding of statutory eligibility (well-

founded fear), and the abuse of discretion standard to the Attorney's General discretionary decision. *See Saleh v. U.S. Dept. Of Justice,* 962 F.2d 234, 238 (2d Cir.1992).

## A. The Proceedings Below

■ The first ruling by the immigration judge found that Dhine was statutorily eligible for asylum as he had a well-founded fear of persecution, but held that he should be denied asylum as a matter of discretion ("Immigration Judge Decision I").

On appeal, the BIA, *sua sponte,* took administrative notice of the fact that President Mengistu of Ethiopia had been overthrown and a new government installed in Ethiopia. The BIA suggested that the possibility of changed conditions in Ethiopia might affect whether Dhine had a legitimate fear of persecution. The case was remanded to the immigration judge for further proceedings ("BIA Decision I").

On remand, Dhine introduced a number of newspaper articles which described how the entire Jewish community was leaving Ethiopia by airlift to Israel. Dhine also testified that he still feared persecution despite the new government. He suggested that statements about free exercise of religion were directed to the Christian majority, rather than the Jews, and that anti-semitism was so deeply ingrained in the Ethiopian tradition that a mere change of government was not going to change the circumstances substantially. The INS presented no evidence regarding the changing circumstances in Ethiopia.

The immigration judge again concluded that Dhine was statutorily eligible for asylum, but that it should be denied in the exercise of discretion ("Immigration Judge Decision II"). Dhine appealed that decision to the BIA.

On appeal, the BIA took further administrative notice of the events that were unfolding in Ethiopia. It noted that Mengistu resigned in May 1991. A few days later, 14,000 Jews were airlifted out of the capital to Israel. A coalition representing 24 political and ethnic groups met to establish a transitional government. The new government advocated freedom of religion. The BIA noted that processing was underway to move the remaining Jews to Israel. Based on these facts, the BIA concluded that Dhine no longer had a well-founded fear of persecution in Ethiopia, and was accordingly statutorily ineligible. They further opined that even if Dhine were statutorily eligible, he should be denied asylum in the exercise of discretion ("BIA Decision II").

## B. Statutory Eligibility

■ There is no dispute on the record below that Dhine had a well-founded fear of persecution when he arrived in this country. His statutory eligibility thus turns on whether conditions have sufficiently changed to permit a legitimate finding that he no longer has a reasonable fear of persecution.

It is not completely clear from the regulations who has the burden of establishing "changed circumstances". I note that regulations promulgated in late 1990, after Dhine filed his application (and therefore inapplicable to his application) places that burden on the INS. *See* 8 C.F.R. 208.16(b)(2)[1]. I think the burden must lie with the INS since the alien has no interest in establishing changed circumstances, and it is conceptually difficult to establish that circumstances have not changed.

■ The BIA's finding as to statutory eligibility is reviewed for substantial evidence. The burden is upon the alien to establish a well-founded fear of persecution. *See Saleh,* 962 F.2d at 238.

The INS did not offer any evidence to support the "changed circumstances" concept. The only evidence of changed circumstances derived from the BIA's administrative notice. The BIA noted that administrative notice is comparable to judicial notice.

1. The regulation provides that once an applicant establishes that he has suffered persecution in the past,

"it shall be presumed that his life or freedom would be threatened on return to that country unless a preponderance of the evidence establishes that conditions in the county have changed to such an extent that it is no longer more likely than not that the application would be so persecuted there."

*See* BIA Decision II, at 3, n. 1. Federal Rule of Evidence 201(b) provides:

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose, accuracy cannot reasonably be questioned.

▉ It was clearly appropriate for the BIA to take notice of the fact that President Mengistu had been overthrown, and a coalition had been trying to establish a transitional government. It was also appropriate for the BIA to notice that the transitional government's charter contained provisions promising freedom of religion. Each of these facts could be easily confirmed by reference to accurate sources. However, the BIA went further than that. It took administrative notice of the fact that there has been no persecution of Jews, and that no Jew could have a well-founded fear of persecution. The sole stated basis for that fact was a single paragraph in 1991 Country Reports on Human Rights Practices at 126, Joint Committee of the Senate and House of Representatives, 102nd Congress, 2nd Session (1992) ("1991 Country Reports").

> Most of Ethiopia's small Jewish population, known as Beta Israel or "Falasha" (a word meaning immigrant or outsider left their traditional homelands in Gondar and Tigray during 1990 and emigrated to Israel in 1991. By year's end, approximately 4,500 Jews were believed to remain in Ethiopia and emigration processing was already under way for these few. There were no reports of violence or discrimination against Jews or "Feres Mora" (Jewish converts to Christianity) by either Mengistu or TG officials during the year.[2]

▉ Whether under present circumstances Ethiopian Jews have a well-founded fear of persecution is a question of fact. But the BIA may only take administrative notice of facts not subject to reasonable dispute. I do not believe that there is sufficient indisputable evidence on the record for the BIA to conclude that the fall of the Mengistu regime and subsequent events necessarily mean an end to persecution against Jews.

The BIA appears to have drawn the conclusion, from what source is not clear, that all of the persecution against Jews stemmed from the Mengistu regime. Since that fact is not generally known in this district, and the BIA does not point to an accurate source for ready determination, I believe that is an inappropriate subject for administrative notice in the context.

Contrary to the conclusion of the BIA, there is evidence in the record that the persecution of Jews has not ended. Numerous newspaper articles referred to the fact that every Jew in Ethiopia had left or was making arrangements to leave. A reasonable inference to be drawn from this complete migration is that conditions for Jews in Ethiopia continued to be intolerable, even after the departure of Mengistu.

Additionally, I have serious doubts as to whether the Country Reports the BIA relied on are sources whose accuracy cannot be questioned. See Fed.R.Evid. 201(b). The 1989 Country Report, which addressed conditions in 1988 when Mengistu was firmly in power, reported that "there have been no reports this year of atrocities or discrimination toward Ethiopian Jewry at the hands of the Ethiopian authorities." 1989 Country Reports on Human Rights Practices at 117, Joint Committee of the Senate and House of Representatives, 101st Congress, 2nd Session (1990). That report directly contradicts the BIA's understanding that the Mengistu regime was responsible for most, if not all, of the persecution against the Jews.

The only evidence militating in favor of a finding of changed circumstances is the BIA's administrative notice that the new regime has promised to permit free exercise of religion.[3] This factor alone, however, is in-

---

**2.** I note that the 1992 Report is identical except that it reports only 1,000 Jews awaiting processing to emigrate to Israel. 1992 Country Reports on Human Rights Practices at 89, Joint Committee of the Senate and the House of Representa-

tives, 103 Congress, 1st Session (1993) (1992 Country Reports).

**3.** The Court notes that the sections of the Country Reports which address the issue of free exer-

sufficient to establish "changed circumstances".

The record below does not contain substantial evidence that changed conditions removed Dhine's well-founded fear of persecution. Consequently, Dhine is statutorily eligible.[4]

## C. The Discretionary Aspect

Once Dhine establishes that he is statutorily eligible for asylum, he must show that he should be granted asylum in the exercise of discretion. The BIA found that even if Dhine were determined statutorily eligible, he should be denied asylum in the exercise of discretion. *See* BIA Decision II, at 4. That decision is reviewed for abuse of discretion. *See Saleh,* 962 F.2d at 238.

The factor that figured most prominently in the BIA's analysis (as well as the decision of the immigration judge who determined that Dhine should be denied asylum in the exercise of discretion) was Dhine's drug convictions. Between 1982 and 1990, Dhine was convicted of four misdemeanors involving drugs, three involving possession, and one involving attempted distribution (of marijuana). Dhine's drug history was the only adverse factor cited by the BIA in affirming the denial of asylum in the exercise of discretion.[5]

In support of his application for asylum, Dhine mentioned a number of factors he believes should militate in favor of a positive exercise of discretion. Dhine notes that he is a linguist who speaks up to nine languages. Moreover, he is a practicing Jew, who has maintained his faith and his observance under most trying conditions while in custody.

He also notes that since being incarcerated, he has held a number of jobs in the Varrick Street facility, and has managed to save a sum of money, some of which he has donated to charity. He has volunteered his language abilities at Varrick Street, translating in the infirmary and in grievance procedures. Most importantly, he has never tested positive for drugs since being in custody, and has never received a disciplinary ticket for any infraction.[6]

Dhine has also cooperated in an investigation directed by the United States Attorney's Office for the Southern District of New York into activities at a INS Processing Center. Dhine not only provided information to investigators, but he also volunteered to, and indeed did, wear a "wire" in an attempt to gather more information.

A psychologist submitted a letter on behalf of Dhine suggesting that Dhine's drug use might be attributable to the traumatic experiences he suffered in Ethiopia. The psychologist explained that Dhine, entering a strange country at the age of 16, where he had no friends, family, or community, after losing his parents and brother in a brutal murder, and being tortured personally, understandably became depressed, and turned to drugs to counter the difficult feelings he was experiencing. Without excusing his drug use, Dhine asks that it be viewed in the context in which it developed.

Dhine also put in evidence that an array of social services would be available to him if he was granted asylum. A social worker from the United Jewish Appeal Federation promised to assist Dhine in obtaining housing, employment and counseling, and an immigra-

---

cise of religion focus on Protestant and Orthodox religions, rather than Judaism.

4. I also note that even if the INS had established changed conditions in Ethiopia, Dhine would be statutorily eligible on the basis of past persecution. *See Matter of Chen,* BIA Interim Decision 3104, 1989 WL 247532 (1989) ("If an alien establishes that he has been persecuted in the past for one of the five reasons listed in the statute, he is eligible for a grant of asylum.") The INS does not dispute that Dhine suffered persecution in the past. Accordingly, he is statutorily eligible for asylum.

5. The BIA also mentioned the "small likelihood of persecution" as a factor militating against a favorable exercise of discretion. *See* BIA Decision II. Since this finding was inappropriate, it shall not be considered in the discretionary analysis.

6. While one's behavior in custody is not the greatest indicator of how one would behave when released, I note that the petitioner's exceptionally clean record since being confined, under what I am aware are less than ideal circumstances, indicate a strength of will which can be drawn upon to assist him in future endeavors.

tion attorney has offered Dhine employment based on his linguistic abilities.

The immigration judge was convinced that Dhine was making a real effort to rehabilitate himself.[7] He doubted, however, whether petitioner could be successful, given his long history of drug use.

The Court must decide whether it was an abuse of discretion to find that a balancing of these factors necessitated a denial of asylum. In Dhine's favor, the trauma he experienced at a young age surely affected his development. And with the help he has received in custody, he has shown an ability to rehabilitate his ways. He has also demonstrated that further assistance in terms of counseling, housing and employment will be made available to him if he is granted asylum. Adversely, there are four misdemeanor drug convictions over an eight year period. The immigration judge's finding[8] was based on a belief that his drug history was too overwhelming to overcome, even in light of the positive factors. I question the basis for that conclusion.

Taking into account the totality of the circumstances, *see Matter of Pula,* BIA Interim Decision 3033, 1987 WL 108948 (1987), I believe Dhine has shown that he should be granted asylum, and that it was an abuse of discretion to deny it on the basis of the drug convictions in light of all of the positive factors.

Moreover, I do not believe that the INS has overcome the rebuttable presumption that arises where an alien has shown past persecution. *See Chen, supra,* (the INS must present evidence that there is little likelihood of present persecution as a factor militating against the favorable exercise of discretion). And in circumstances where the alien does have a well-founded fear of persecution like Dhine has established, "the danger of persecution should generally outweigh all by the most egregious of adverse factors." *Matter of Pula, supra.*

I conclude that it was an abuse of discretion for the BIA and the immigration judge to conclude that Dhine should be denied asylum. Accordingly, Dhine was improperly denied asylum in the proceedings below.

### III. *Withholding of Deportation*

Because this Court has ruled favorably on Dhine's application for asylum, it need not reach the question of whether he is entitled to an order withholding deportation. The Court notes, however, that it believes Dhine would have a meritorious claim on that ground as well.

Counsel for petitioner are directed to settle an order of judgment consistent with this opinion on five (5) days' notice.

It is SO ORDERED.

---

7. "I once again carefully reviewed the entire record with reference to the discretionary aspect of this case. I believe the applicant's actions certainly while he has been incarcerated in Service custody have been commendable. There's no doubt in my mind he is trying to reform. He is making every effort to prepare himself to be integrated to society in the United States." Immigration Judge Decision II, at 5.

8. I look to the immigration judge's decision rather than the BIA's decision since that was impermissibly tainted by the conclusion that Dhine faced little danger of future persecution if he returned to Ethiopia.