[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 10, 2005
THOMAS  K. KAHN
CLERK

No. 04-12185
Non-Argument Calendar
_____

Agency Nos. A79-340-983 and A79-340-984

ANA ERIKA GARCIA,
JOSE VICENTE DIAZ, et al.,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(August 10, 2005)**

Before BIRCH, BLACK and PRYOR, Circuit Judges.

PER CURIAM:

Anna Erika Garcia[1] and her three children, Jose, Milena, and Laura Diaz, all natives and citizens of Colombia, seek review of the Board of Immigration Appeals' ("BIA") order affirming without opinion the immigration judge's ("IJ") removal order. For the reasons discussed below, we **DENY** Garcia's petition.

## I. BACKGROUND

On 29 April 2000, Garcia and her daughter Milena were admitted to the United States as nonimmigrant visitors for pleasure with authorization to remain until 28 October 2000. Garcia's son Jose and her other daughter Laura were admitted to the United States as nonimmigrant visitors on 16 October 1999, and 16 August 2000, respectively. On 2 April 2001, the Immigration and Naturalization Service[2] ("INS") issued Garcia and her children notices to appear, charging them with removability under the Immigration and Nationality Act ("INA") § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), for remaining in the United States for a time longer than permitted. Garcia filed an application for asylum,

---

[1] Garcia is the primary applicant in this case. Her children are derivative applicants. Accordingly, this opinion refers to Garcia and her claims for relief.

[2] On 25 November 2002, President Bush signed into law the Homeland Security Act of 2002 ("HSA"). Pub. L. No. 107-296, 116 Stat. 2135. The HSA abolished the INS and transferred its functions to a new Department of Homeland Security ("DHS"). This opinion refers to the agency as the INS because the case was initiated while the INS was still in existence.

withholding of removal, and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman, and Degrading Treatment or Punishment ("CAT"). She alleged that she and her family were persecuted by the National Liberation Army ("ELN") on account of their political opinion.

In her application and testimony before the IJ, Garcia stated the following specific facts. In October 1997, the ELN began making threatening phone calls to a sporting goods store in Cartagena, Colombia, that was owned by her father-in-law, Cijarmo Diaz. In the calls, the ELN guerillas demanded "collaboration for their revolution," Administrative Record ("AR") at 214, stated that they possessed information about the activities of all family members, and warned that consequences would follow if Cijarmo's family "was not in agreement with their ideals," id. at 82. Additionally, the ELN demanded 700 million pesos from Cijarmo's family. The family reported the threats to the Security Administration Department ("DAS"). The DAS monitored the calls for one year in hopes of apprehending the callers but determined that the calls were made from public phones in various locations. Cijarmo's store continued to receive three or four threatening calls per month until April 2000. Additionally, beginning in August 1999, the ELN made three or four threatening calls to Garcia's home. The callers stated that the ELN would kinap or kill a family member if the family did not

3

succumb to their financial demands.

Garcia's family, although disturbed by the threats, rejected the ELN's demands. As a result, claims Garcia, her brother-in-law was assassinated on 12 March 1998, and Garcia's family became military targets of the ELN. The family moved from house to house and stayed with different relatives. The threats continued, and on 13 October 1999, the ELN callers warned Garcia's husband, Guillermo Diaz, that they planned to kidnap Garcia's son Jose and force him to join the guerrillas. On 16 October 1999, Garcia and her husband, "[i]n total panic and fear," sent Jose to Miami "to protect his life." Id. at 214. The callers then started making threats against Garcia's daughters. Garcia's husband did not have a visa to travel to the United States, but on 19 April 2000, Garcia and her daughter Milena traveled to Miami to save their lives and reunite with Jose. Garcia left her other daughter Laura with her father to avoid creating suspicion that the whole family was leaving the country. On 16 August 2000, Garcia's husband sent Laura to the United States. Garcia fears that if her family returns to Colombia, the ELN will abduct, torture, and kill them because they had refused to collaborate with the guerrillas.

Garcia presented a 2002 report from the United Nations Refugee Agency entitled, "International Protection Considerations Regarding Colombian Asylum-

4

seekers and Refugees" ("the UN Report").  The UN Report indicates that extortion practices, including ransoms, "war taxes," and other forced payments were commonplace in Colombia in 2001.  The UN Report states that "[k]idnapping and extortion take place both as a form of persecution to target (perceived) political opponents and to finance political / military activities."  The UN Report attributes only 10% of kidnapings to purely criminal motives.  The UN Report concluded that there was no viable relocation alternative in Colombia.[3]

Additionally, the government submitted the U.S. State Department's Colombia Country Report on Human Rights Practices for 2001 ("2001 Country Report").  The 2001 Country Report notes the government's continued struggle to gain control over its territory in the face of persistent and widespread internal armed conflict and violence, both political and criminal.  Government security forces, paramilitary groups, guerrillas, and narcotics traffickers were the principal participants in this conflict.

According to the 2001 Country Report, the ELN regularly attacked civilian populations and committed massacres and summary executions.  The guerillas targeted various citizen groups, including business owners.  Furthermore, guerilla groups typically sent its victims letters demanding payment of a "war tax" and

_____

[3] Garcia also submitted various other documents in support of her asylum application.

5

threatening to mark victims as military targets if they failed to comply. Guerrillas were responsible for the majority of kidnapings in the country, undertook armed actions in nearly 1,000 of the country's 1,097 municipalities, and were responsible for at least 1,075 civilian deaths between January and November of 2000. "Numerous credible sources reported cases of murder, rape, kidnaping, extortion, robbery, threats, . . . and the forced recruitment of adults and children."

The IJ denied relief and ordered the petitioners removed to Colombia. In a subsequent oral decision, the IJ found that Garcia's testimony was credible. The IJ concluded, however, that the ELN's requests for money from Cijarmo and the subsequent threatening phone calls were not based on any protected ground: Garcia did not belong to any political organization, and nothing in the record indicated that Garcia's husband or Cijarmo were active members or had important roles within the Conservative party or any other political group or organization. Accordingly, Garcia failed to establish a well-founded fear based on account of five statutory categories. Additionally, the IJ found that Garcia could not qualify for withholding of removal since she could not satisfy the lower burden of proof required for asylum. Finally, the IJ determined that nothing in the record indicated that Garcia would be tortured within the meaning of the CAT upon her return to Colombia. The BIA adopted and affirmed the IJ's decision without opinion,

6

pursuant to 8 C.F.R. § 1003.1(e)(4).

## II. DISCUSSION

On appeal, Garcia argues that she qualifies for asylum under the INA because she suffered past persecution on account of (1) her membership in a particular social group, which she describes as her own family or prosperous business owners; (2) her and her family's political opinion; and (3) the political opinion imputed to her family by the ELN when her family refused to comply with its extortion demands. Additionally, Garcia asserts that she qualifies for relief under CAT.[4]

When the BIA summarily affirms the decision of IJ without an opinion, we review the IJ's decision as the final removal order. Sepulveda v. U.S. Attorney Gen., 401 F.3d 1226, 1230 (11th Cir. 2005) (per curiam). We review the IJ's factual determinations under the highly deferential substantial evidence test. Under this test, we "must affirm the [IJ's] decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole,'" Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (citation omitted), and we can reverse the IJ's decision "only if the evidence 'compels' a

---

[4] Because Garcia's removal proceedings commenced after 1 April 1997, her case is governed by the permanent provisions of the INA, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Gonzalez-Oropeza v. U.S. Att'y Gen., 321 F.3d 1331, 1332 (11th Cir. 2003) (per curiam).

7

reasonable fact finder to find otherwise." Sepulveda, 401 F.3d at 1230 (citation omitted). To the extent that the IJ's ruling is based on the interpretation of applicable statutes, we review de novo. Mazariegos v. U.S. Attorney Gen., 241 F.3d 1320, 1324 (11th Cir. 2001). Keeping these standards in mind, we will address each of Garcia's claims in turn.

A.    Asylum

Any alien who arrives in or is present in the United States may apply for asylum. See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). A "refugee" is

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....

8 U.S.C. § 1101(a)(42)(A) (emphasis added). The asylum applicant carries the burden of proving statutory "refugee" status. See Al Najjar, 257 F.3d at 1284.

To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of her actual or imputed political opinion or membership in a social group, or (2) a "well-founded fear" that

8

her actual or imputed political opinion or membership in a social group will cause such future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. An asylum applicant's mere showing that she possesses a protected characteristic is insufficient. Rather, she must show persecution because of that protected characteristic. See INS v. Elias-Zacarias, 502 U.S. 478, 483, 112 S. Ct. 812, 816 (1992). Satisfying this burden "requires the alien to present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of" the statutorily listed factor. Al Najjar, 257 F.3d at 1287 (internal quotation omitted) (emphasis in the original). We have recognized that evidence that is "consistent with acts of private violence" or that "shows merely that an individual has been the victim of criminal activity does not constitute evidence of persecution on a statutorily protected ground." See Sanchez v. Attorney General, 392 F.3d 434, 438 (11th Cir. 2004) (citing Abdille v. Ashcroft, 242 F.3d 477, 494-95 (3d Cir. 2001)); see also Bolshakov v. INS, 133 F.3d 1279, 1280-81 (9th Cir. 1998) (holding that petitioners' refusal to meet payment demands, which resulted in repeated threats and physical violence, was evidence only that "they had been the victim of criminal activity").

The BIA defines "membership in a particular social group" as persons who hold an immutable characteristic or common trait such as sex, color, kinship, or, in

9

some cases, shared past experiences such as land ownership or military service. Matter of Acosta, 19 I. & N. Dec. 211, 233 (BIA 1985), overruled on other grounds by Matter of Mogharrabi, 19 I. & N. Dec. 439, 439 (BIA 1987). In other words, under the BIA's interpretation, the common characteristic defining a particular social group "must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." Id. We defer to the BIA's interpretation of ambiguous statutory language if it is reasonable and does not contradict the clear intent of Congress. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44, 104 S. Ct. 2778, 2781-82 (1984).

Groups of people who are connected only on the basis of their "economic status do not form a social group for asylum purposes." Li v. INS, 92 F.3d 985, 987 (9th Cir. 1996) (addressing whether "low economic status" constitutes a social group for asylum purposes); see also Saleh v. United States Dep't of Justice, 962 F.2d 234, 240 (2d Cir. 1992) (poor Yemeni Moslems do not constitute a protected social group because the traits that define them are not "recognizable and discreet"); In re V-T-S-, 21 I. & N. Dec. 792, 799 (BIA 1997) (finding no valid asylum claim where kidnaping was motivated by petitioner's ability to pay a ransom, rather than membership in a social group). Although our circuit has not

10

yet addressed the issue, several circuits have concluded that a family may constitute a "social group" for establishing refugee status. See, e.g., Gebremichael v. I.N.S., 10 F.3d 28, 36 (1st Cir. 1993); Iliev v. INS, 127 F.3d 638, 642 n.4 (7th Cir. 1997). As with any other claim for asylum on account of a protected ground, however, an applicant claiming past or future persecution on this basis must demonstrate a nexus between the alleged persecution and his family membership. Lopez-Soto v. Ashcroft, 383 F.3d 228, 235-38 (4th Cir. 2004); see INS v. Elias-Zacarias, 502 U.S. at 483, 112 S. Ct. at 816.

In this case, we conclude that substantial evidence supports the IJ's conclusion that Garcia did not show past persecution or a well-founded fear of future persecution on account of her membership in a particular social group. First, even assuming that Garcia's family constitutes a "social group" for purposes of establishing refugee status, substantial evidence indicates that ELN guerillas targeted Garcia's family on account of their desire for money to finance their activities rather than because of any family relationship. Garcia herself attributed a financial motive to the callers. Second, we conclude that Garcia cannot establish that she was a member of a protected class simply by being related to wealthy business owners. As stated previously, shared economic status does not create a social group for asylum purposes. Third, even if Garcia could establish that

11

wealthy business owners constituted a particular social group, she failed to show that her family was persecuted on account of their status as business owners or had a well-founded fear of persecution on this ground. As stated previously, substantial evidence supports a finding that Garcia's family was the victim of extortion by the ELN.

> We have held that
>
> an imputed political opinion, whether correctly or incorrectly attributed, may constitute a ground for a well-founded fear of political persecution within the meaning of the INA. An asylum applicant may prevail on a theory of imputed political opinion if [she] shows that the persecutor falsely attributed an opinion to [her], and then persecuted [her] because of that mistaken belief about [her] views.

See Al Najjar, 257 F.3d at 1289 (citations and quotations omitted). As with other protected grounds, an applicant seeking asylum on the basis of alleged persecution by guerillas "must establish that the guerillas persecuted her or will seek to persecute her in the future *because of* her actual or imputed political opinion. It is not enough to show that she was or will be persecuted or tortured due to her refusal to cooperate with the guerillas." See Sanchez, 392 F.3d at 438 (discussing required nexus in the context of a claim for withholding of removal) (citation omitted).

In this case, we conclude that substantial evidence supports the IJ's conclusion that Garcia failed to show past persecution or a well-founded fear of persecution on account of her actual or imputed political opinion. Garcia presented

12

no evidence as to her actual political opinion, and, to the contrary, candidly admitted that she does not belong to any political party or organization. As for the actual political beliefs of her husband and father-in-law, Garcia failed to establish a nexus between their beliefs and the alleged persecution. Garcia stated that her husband and father-in-law were members of the Colombian Conservative Party, but she indicated that they were not active members or party leaders. Beyond testifying that the ELN guerillas generally threaten those who do not agree with their ideals, she presented no evidence that the guerillas had knowledge of the political affiliation of her husband and father-in-law or based their extortion on that affiliation. Furthermore, Garcia's family's refusal to support the ELN monetarily or to cooperate with them in other ways does not constitute an actual or imputed political opinion. See Sanchez, 392 F.3d at 438. For these reasons, we conclude that the BIA properly affirmed the IJ's denial of Garcia's claim for asylum.

B.    CAT Relief

We may review a final order of removal only if the alien has exhausted all administrative remedies available to the alien as of right. See 8 U.S.C. § 1252(d)(1). We have interpreted the exhaustion requirement in 8 U.S.C. § 1252(d)(1) to be jurisdictional and concluded that "we lack jurisdiction to consider claims that have not been raised before the BIA." Sundar v. INS, 328 F.3d 1320,

13

1323 (11th Cir. 2003).

Because Garcia failed to challenge before the BIA the IJ's finding that she did not qualify for relief under the CAT, we lack subject matter jurisdiction to review her argument that she is entitled to CAT relief.[5]

## III.  CONCLUSION

After reviewing the record and the contentions of the parties, we conclude that there was substantial evidence to support the IJ's determination that Garcia is not entitled to asylum.  Additionally, we do not possess subject matter jurisdiction over Garcia's claim that she is entitled to CAT relief because she did not raise this argument before the BIA.  Accordingly, her petition is **DENIED**.

---

[5] We cannot discern from Garcia's brief whether she intends to appeal the IJ's denial of her application for withholding of removal.  To the extent that she does raise this issue, we decline to review it because Garcia did not raise it before the BIA.  See Cadet v. Bulger, 377 F.3d 1173, 1179 (11th Cir. 2004) (noting our "obligat[ion] to inquire into subject-matter jurisdiction sua sponte whenever it may be lacking") (quotation omitted).