55 F.3d 732
 63 USLW 2741
 Xin-Chang ZHANG, Petitioner-Appellee,
v.
William SLATTERY, as District Director of the New York
District of the Immigration & Naturalization Service, and
Roseanne C. Sonchik, as Acting Assistant District Director
for Detention and Deportation of the New York District of
the Immigration & Naturalization Service, Respondents-Appellants.
 No. 1403, Docket 94-6258.
 United States Court of Appeals, Second Circuit.
 Argued Feb. 15, 1995.
Decided May 19, 1995.
 
 Naill J. Lenihan, pro hac vice, New York City (Ogden N. Lewis, Michael Osborne, Vina Shukla, Law Clerk, Jerome Wilson, Law Clerk, Davis Polk & Wardwell, New York City, Stanley Mark, Asian-American Legal Defense and Education Fund, New York City, on the brief) for petitioner-appellee.
 Diogenes P. Kekatos, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty. for the S.D. of N.Y., Steven I. Froot, Asst. U.S. Atty., F. James Loprest, Jr., Special Asst. U.S. Atty., on the brief), for respondents-appellants.
 Bruno Joseph Bembi, Hempstead, NY, for amicus curiae Yau Gwong Liu, Hua Qing Li, and Shu Yao Li.
 Before: MINER and JACOBS, Circuit Judges.*
 JACOBS, Circuit Judge:
 Petitioner-appellee Xin-Chang Zhang, a native of the People's Republic of China ("PRC" or "China"), arrived on a Rockaway, Queens beach in June 1993 after more than three months' transit in the cargo hold of the smuggling ship "Golden Venture". Within hours of the ship's grounding, Zhang was in the custody of the Immigration and Naturalization Service ("INS"). This appeal arises out of Zhang's petition for habeas corpus filed in the United States District Court for the Southern District of New York (Patterson, J.). See Xin-Chang v. Slattery, 859 F.Supp. 708 (S.D.N.Y.1994) (hereinafter "Zhang ", the form of the name favored by appellee's counsel).
 
 
 1
 The INS challenges the district court's order remanding Zhang's case to the Board of Immigration Appeals ("BIA") for further consideration. Zhang's petition challenged a March 22, 1994 decision of the BIA which affirmed the findings of the Immigration Judge ("IJ") and denied his application for asylum and withholding of return to China, and ordered him excluded from the United States. The district court found that the IJ and BIA had (1) erroneously relied on the BIA's earlier decision in Matter of Chang, Int.Dec. No. 3107, 1989 WL 247513, 1989 BIA LEXIS 13 (BIA May 12, 1989) and (2) improperly subjected Zhang to exclusion proceedings (as opposed to deportation proceedings) without first requiring the government to prove that Zhang had failed to achieve "entry" into the United States. The government challenges both of these conclusions on appeal.
 
 
 2
 Zhang's primary argument both before the district court and on appeal is that the United States must grant (or at least give serious consideration to) petitions for refugee status filed by asylum applicants who demonstrate a well-founded fear that, if forced to return to their own country, they would be subject to forced abortions or forced sterilization pursuant to a coercive government program of family planning. Zhang's position has been adopted in various forms at various times by the President of the United States, both houses of Congress, three Attorneys General and the General Counsel of the INS. On this appeal, however, the government demonstrates that, throughout the long debate over this question, the BIA--the agency that denied Zhang's claims and that issued the ruling we review--has consistently refused to grant asylum or withholding of return to an alien who alleges no more than a fear of being subject to a coercive family planning program.
 
 
 3
 This state of affairs has led to conflicting district court opinions, illustrated by a comparison of the opinion of district court in this case, Zhang, 859 F.Supp. 708, with the opinion of the district court in Si v. Slattery, 864 F.Supp. 397 (S.D.N.Y.1994), the appeal of which was briefed, argued and submitted in tandem with this case (and later withdrawn by stipulation). After reviewing the various executive and legislative initiatives and pronouncements on this subject, we conclude that, under established administrative law, none of them has displaced or overruled the BIA's decision in Chang, the case in which the BIA first announced its policy regarding asylum and the PRC's coercive family planning program (the "one child" policy). Zhang's alleged fear that he will be forcibly sterilized if he is returned to China is not sufficient to entitle him to a grant of either asylum or withholding of return.
 
 
 4
 Our result is ironic in light of seemingly purposeful efforts by the executive branch and the houses of Congress to achieve the opposite outcome. The executive and legislative branches together have ample power to consummate any goal affecting the country's immigration laws. However, where they fail to do so, we will not amend the deficiency.
 
 
 5
 The second question presented on this appeal is whether (as the government contends) Zhang is properly the subject of exclusion proceedings on the ground that he was intercepted before he "entered" the country (as the term is defined by the immigration laws). Zhang claims that he effected entry the night his ship arrived off the shores of Rockaway, Queens, and is therefore subject to the (procedurally more vigorous) deportation proceedings. We conclude that Zhang's claim of entry is without merit.
 
 
 6
 We therefore reverse the order of the district court. Zhang's petition for a writ of habeas corpus must be dismissed.
 
 BACKGROUND
 
 7
 A. The Legal Framework.
 
 
 8
 Excludable aliens who claim that they will be persecuted if forced to return home may seek two alternative forms of relief: asylum and withholding of return. The two remedies are "closely related and appear to overlap." Carranza-Hernandez v. INS, 12 F.3d 4, 7 (2d Cir.1993) (citation omitted). Nevertheless, they differ in the burden of proof placed on the applicant and in the extent of the relief afforded. An alien seeking asylum need only demonstrate that the fear of persecution is well founded while an alien seeking withholding of return must establish a "clear probability" of persecution if returned home. Id. Asylum gives the alien the right to legally remain in the United States, while withholding of return only enables the alien to avoid returning to the country in which the persecution would occur. In his immigration proceedings, Zhang has sought grants of both asylum and withholding of return.
 
 
 9
 Under 8 U.S.C. Sec. 1158, an "alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." A "refugee" in turn is defined as:
 
 
 10
 [A]ny person who is outside any country of such person's nationality ... who is unable or unwilling to return to ... that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.
 
 
 11
 8 U.S.C. Sec. 1101(a)(42)(A). The applicant bears the burden of establishing that past persecution took place or that the applicant has a well-founded fear of future persecution "on account of" one of the five groupings listed in Sec. 1101(a)(42)(A). See Saleh v. United States Dep't of Justice, 962 F.2d 234, 238-39 (2d Cir.1992). Even if an alien has met this burden, and thereby met the requirements for refugee status, the ultimate decision to grant asylum is in the discretion of the Attorney General. 8 U.S.C. Sec. 1158(a); INS v. Cardoza-Fonseca, 480 U.S. 421, 428 n. 5, 107 S.Ct. 1207, 1211 n. 5, 94 L.Ed.2d 434 (1987) ("It is important to note that the Attorney General is not required to grant asylum to everyone who meets the definition of refugee.").
 
 
 12
 By contrast, the withholding of return is an entitlement for any alien who has demonstrated a "clear probability," Cardoza-Fonseca, 480 U.S. at 430, 107 S.Ct. at 1212, that his or her "life or freedom would be threatened in [a] country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. Sec. 1253(h)(1). Thus, while the withholding of return is non-discretionary, eligibility for this relief entails the higher ("clear probability") burden of proof. An applicant who has failed to satisfy the requirements for asylum has necessarily failed to satisfy the requirements for withholding of return. Because of the similarity of the respective inquiries and because withholding of return requires a higher standard of proof, we will hereinafter characterize Zhang's claim as one for refugee status, the statutory pre-requisite to asylum.
 
 
 13
 Since the 1970s China has enforced a coercive family planning program under which PRC citizens are encouraged to have no more than one child. Zhang contends that the PRC has been known to implement this policy on occasion by forcing its citizens to undergo abortions and sterilizations. On August 5, 1988, Attorney General Edwin Meese issued guidelines to the INS stating that asylum could be granted to applicants alleging a well-founded fear of persecution based on China's coercive family planning programs:
 
 
 14
 All INS asylum adjudicators are to give careful consideration to applications from nationals of the People's Republic of China who express a fear of persecution upon return to the PRC because they refuse to abort a pregnancy or resist sterilization after the birth of a second or subsequent child in violation of Chinese Communist Party directives on population. If such refusal is undertaken as an act of conscience with full awareness of the urgent priority assigned to that policy by high level PRC officials and local party cadres at all levels as well as of the severe consequences which may be imposed for violation of the policy, it may be appropriate to view such refusal as an act of political defiance sufficient to establish refugee status under 8 U.S.C. Sec. 1101(a)(42)(A).
 
 
 15
 Mem. from the Office of Attorney General Meese to INS Commissioner Alan Nelson, at 1 (Aug. 5, 1988), Joint Appendix ("JA") at 1682.
 
 
 16
 In 1989, the BIA considered the PRC's "one child" policy in light of the definition of "refugee" given in Sec. 1101(a)(42)(A). The BIA's opinion in Chang found that the Attorney General's August 5, 1988 memorandum did not control the BIA's analysis because it was "directed to the Immigration and Naturalization Service, rather than the immigration judges and [the BIA]." 1989 WL 247513, 1989 BIA LEXIS 13, at * 11-12. After a review of the law, the Chang opinion concluded:
 
 
 17
 The [PRC g]overnment is concerned not only with the ability of its citizens to survive, but also with their housing, education, medical services, and the other benefits of life that persons in many other societies take for granted. For China to fail to take steps to prevent births might well mean that many millions of people would be condemned to, at best, the most marginal existence. The record reflects that China was in fact encouraged by world opinion to take measures to control its population.
 
 
 18
 There is no evidence that the goal of China's policy is other than as stated, or that it is a subterfuge for persecuting any portion of the Chinese citizenry on account of one of the reasons enumerated in section 101(a)(42)(A) of the [Immigration] Act. The policy does not prevent couples from having children but strives to limit the size of the family. It appears that exceptions are made so that couples facing certain hardships may have another child....
 
 
 19
 We cannot find that implementation of the "one couple, one child" policy in and of itself, even to the extent that involuntary sterilizations may occur, is persecution or creates a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." This is not to say that such a policy could not be implemented in such a way as to individuals or categories of persons so as to be persecution on account of a ground protected by the Act. To the extent, however, that such a policy is solely tied to controlling population, rather than as a guise for acting against people for reasons protected by the Act, we cannot find that persons who do not wish to have the policy applied to them are victims of persecution or have a well-founded fear of persecution within the present scope of the Act....
 
 
 20
 1989 WL 247513, 1989 BIA LEXIS 13, at * 12-14. Since issuing Chang, the BIA has consistently followed it. See, e.g., Matter of G--, Int.Dec. 3215, 1993 WL 522159, 1993 BIA LEXIS 14 (BIA Dec. 8, 1993).
 
 
 21
 In reaction to the decision in Chang, and the contemporaneous events in Tiananmen Square, Congress considered the Emergency Chinese Immigration Relief Act of 1989. That proposed act included a provision which would have effectively overruled Chang and allowed refugee status to be conferred on the basis of China's family planning policies. See 135 Cong.Rec.S.Doc. No. 8241-2 (July 19, 1989).[1] The Act passed both houses of Congress, but was vetoed by President Bush. Although the House of Representatives mustered the two-thirds vote to override this veto, the Senate fell short by five votes and the bill never became law.
 
 
 22
 In vetoing this legislation, President Bush claimed that he could "accomplish the laudable objectives of Congress" by executive action. Mem. of Disapproval for the Emergency Chinese Relief Act of 1989, 25 Weekly Compilation of Presidential Documents at 1853-54 (1989). He thereupon directed the Attorney General to give "enhanced consideration [to] ... individuals from any country who express a fear of persecution upon returning to their country related to their country's policy of forced abortion or coerced sterilization." Id. In January 1990, Attorney General Dick Thornburgh promulgated a rule, designated an "[i]nterim rule with requests for comments", which was duly published in the Federal Register (the "January 1990 interim rule"). This rule amended 8 C.F.R. Sec. 208.5 to provide that:
 
 
 23
 1. Aliens who have a well-founded fear that they will be required to abort a pregnancy or to be sterilized because of their country's family planning policies may be granted asylum on the ground of persecution on account of political opinion.
 
 
 24
 2. An applicant who establishes that the applicant (or the applicant's spouse) has refused to abort a pregnancy or to be sterilized in violation of a country's family planning policy, and who has a well-founded fear that he or she will be required to abort a pregnancy or to be sterilized or otherwise persecuted if the applicant were returned to such country may be granted asylum.
 
 
 25
 55 Fed.Reg. 2803, 2805.
 
 
 26
 On April 11, 1990, President Bush issued Executive Order 12,711:The Secretary of State and the Attorney General are directed to provide for enhanced consideration under the immigration laws for individuals from any country who express a fear of persecution upon return to their country related to that country's policy of forced abortion or coerced sterilization, as implemented by the Attorney General's regulation effective January 29, 1990.
 
 
 27
 Exec. Order No. 12,711, Sec. 4, 55 Fed.Reg. 13,897 (1990).
 
 
 28
 In July 1990, Attorney General Thornburgh published a final rule, outlining comprehensive procedures to be used in determining asylum under section 208. That rule, however, made no mention of the January 1990 interim rule, the "one child" policy of the PRC, or the practice of forced abortion or sterilization. See 55 Fed.Reg. 30674. No explanation for this omission was offered by the Attorney General, and none can be deduced from a review of the July 1990 rule.
 
 
 29
 This omission of the interim rule evidently generated some confusion within the Justice Department. In April 1990, the Chief Attorney Examiner of the BIA asked the Appellate Counsel of the INS to clarify the status of the January 1990 interim rule. The Appellate Counsel responded that the January 1990 interim rule remained in effect. On November 7, 1991, the Office of the General Counsel of the INS sent a letter to Regional and District Counsel, stating that Department of Justice and INS "policy with respect to aliens claiming asylum or withholding of deportation based upon coercive family planning policies is that the application of such coercive policies does constitute persecution on account of political opinion." The letter directed that INS trial attorneys act accordingly.
 
 
 30
 On January 15, 1993 Attorney General William P. Barr signed a final rule which provided in pertinent part:
 
 
 31
 An applicant (and the applicant's spouse, if also an applicant) shall be found to be a refugee on the basis of past persecution on account of political opinion if the applicant establishes that, pursuant to the implementation by the country of the applicant's nationality or last habitual residence of a family planning policy that involves or results in forced abortion or coerced sterilization, the applicant has been forced to abort a pregnancy or to undergo sterilization or has been persecuted for failure or refusal to do so, and that the applicant is unable or unwilling to return to, or to avail himself or herself of the protection of, that country because of such persecution.
 
 
 32
 * * * * * *
 
 
 33
 An applicant (and the applicant's spouse, if also an applicant) shall be found to be a refugee on the basis of a well-founded fear of persecution on account of political opinion if the applicant establishes a well-founded fear that, pursuant to the implementation by the country of the applicant's nationality or last habitual residence of a family planning policy that involves or results in forced abortion or coerced sterilization, the applicant will be forced to abort a pregnancy or to undergo sterilization or will be persecuted for failure or refusal to do so, and that the applicant is unable or unwilling to return to, or to avail himself or herself of the protection of, that country because of such fear.
 
 
 34
 January 1993 Rule, Sec. 208.13(2)(ii), Att'y Gen. Order No. 1659-93, JA 1652, 1664-65 (the "January 1993 final rule"). The commentary accompanying this final rule observed:
 
 
 35
 One effect of this rule is to supersede the Board [of Immigration Appeals] in Matter of Chang, Int.Dec. No. 3107 (BIA 1989), to the extent it held that the threat of forced abortion or involuntary sterilization pursuant to a government family planning policy does not give rise to a well-founded fear of persecution on account of political opinion, without an additional showing on the issue of the applicant's actual political opinion.
 
 
 36
 JA 1655. The January 1993 final rule was the clearest departure from Chang. The prior administrative actions had merely suggested that refugee status may be granted to individuals facing forced abortion or sterilization in China; the January 1993 final rule mandated the grant of refugee status upon the proper showing.
 
 
 37
 The signed January 1993 final rule was sent to the Federal Register, where it was made available for public inspection and scheduled for publication on January 25, 1993--after the inauguration of President Clinton. However, on January 22, 1993, following the inauguration, the proposed Director of the Office of Management and Budget issued a directive prohibiting the publication of new regulations until they were approved by an agency head appointed by the new Administration. See 58 Fed.Reg. 6074 (1993).
 
 
 38
 The January 1993 final rule signed by outgoing Attorney General Barr was never published. In February 1993, regulations concerning asylum applications were again published; but these February modifications made no mention of the January rule. See 8 C.F.R. Parts 103, 208, 236, 253 (1993).
 
 
 39
 In the meantime, the BIA encountered additional cases of individuals seeking asylum based on the PRC's "one child" policy. In June 1993, the BIA referred two of these cases to Attorney General Janet Reno pursuant to 8 C.F.R. Sec. 3.1(h)(1)(ii). In its referral to the Attorney General, the BIA asked her to resolve the apparent conflict between Executive Order 12,711 and Chang. In December 1993 the Attorney General formally declined to resolve the evident conflict, because it was "apparent" to her that the resolution of the two cases presented did not "require a determination that one or the other of these standards is lawful and binding." Att'y Gen. Order No. 1756-93; JA at 1650.
 
 
 40
 On appeal, Zhang directs our attention to the January 1990 interim rule, President Bush's Executive Order No. 12,711 and the January 1993 final rule. He argues that one or more of these administrative acts served to overrule Chang and that the BIA erred in relying upon Chang when it reviewed his request for asylum.
 
 
 41
 B. Zhang's History.
 
 
 42
 Zhang is a native of Fujian province.[2] Shortly after the 1991 birth of his first child, state officials contacted Zhang and demanded that his wife agree to the insertion of an intra-uterine contraceptive device. Despite her apparent compliance with this request, state officials soon returned to demand that either he or his wife undergo a sterilization procedure.
 
 
 43
 Zhang and his wife responded that she could not undergo the procedure because of ill health. The officials rejected this excuse, insisted that one of the spouses undergo the procedure, and threatened that failure to comply would result in a fine followed by a forced sterilization. Zhang claimed that he and his wife resisted undergoing the procedure because they wished to have more children, because they disagreed with China's "one child" policy and because they believed people should be free to have as many children as they wish. In December 1991, Zhang fled his home. While his wife and son went into hiding, he spent several months working in the nearby city of Fuzhou. Zhang eventually made arrangements with smugglers, and left aboard the "Golden Venture" in February 1993. For the voyage, Zhang paid the smugglers a deposit of $5,000, and promised to pay the balance of another $25,000 sometime after he arrived in the United States.
 
 
 44
 According to documents submitted by the government, Zhang's story to this point resembles the accounts offered by many other asylum applicants from Fujian Province. One of the common elements of these stories is the allegation "that a wife was ill and could not undergo sterilization, so the husband was chosen to undergo the procedure and therefore had to flee to the U.S."[3] Asylum Claims Relating to Family Planning in Fujian Province, China, United States Dep't of State, Office of Asylum Affairs, May, 1993, JA at 1082. Such an archetypal narrative would allow an unaccompanied male to meet the eligibility parameters expressed in the executive order and the proposed rules: the sickness of the wife focuses the governmental sterilization effort on the husband, and accounts for why the government would not simply sterilize the wife during the husband's absence from the country.[4]
 
 
 45
 Zhang was one of the more than 300 passengers from China aboard the "Golden Venture" when it struck a sandbar off Rockaway, Queens in the early morning hours of June 6, 1993. He fled the ship and swam to the beach where he was promptly taken into custody by law enforcement officials. He was initially moved to a Red Cross center and was thereafter transferred to the custody of the INS.[5]
 
 
 46
 Zhang made an initial appearance before IJ Alan L. Page in New York on June 30, 1993. After considering Zhang's description of the grounding of the "Golden Venture", the IJ found that Zhang had never effected an "entry" into the United States and that he had been properly placed into exclusion proceedings. Zhang challenged this finding and filed a formal motion to terminate the proceedings on July 9, 1993. The IJ rejected this motion on July 16, 1993. Zhang appealed this finding to the BIA, which on December 22, 1993, declined to consider the interlocutory appeal.
 
 
 47
 Also on July 16, 1993, Zhang submitted an application for asylum and withholding of return in which he detailed the circumstances of his departure from China and averred that he had a well-founded fear that if returned to China he would be persecuted by being subjected to a sterilization procedure in accordance with the PRC's "one child" policy. On September 22, 1993, the IJ issued a written opinion denying Zhang's application for asylum and withholding of return, concluding that Zhang had failed to establish a "well-founded fear of persecution within the meaning of [the] asylum laws." JA 1272. In rendering this decision, the IJ concluded that he was bound by the BIA's decision in Chang. The IJ also rejected claims that Zhang had established a well-founded fear of persecution based on his membership in a "particular social group" as either (a) a family man who wanted to have a second child, or (b) one of those who had departed China illegally.
 
 
 48
 In his appeal to the BIA, Zhang challenged the IJ's denial of his asylum and withholding claims as well as the IJ's rejection of his motion to terminate exclusion proceedings. On March 22, 1994, the BIA affirmed the IJ's decision, relying predominantly on Chang. In affirming the IJ's denial of Zhang's motion to terminate exclusion proceedings, the BIA found that Zhang had "clearly failed to sustain his burden of showing that he was, at any relevant time, free from official restraint." JA 5.
 
 
 49
 Zhang then filed a petition for writ of habeas corpus in the Southern District of New York, challenging the BIA's denial of his request for asylum and withholding of return proceedings, as well as the determination that he had never "entered" the United States. On August 8, 1994, the district court issued an opinion and order, remanding Zhang's case to the BIA for "application of the appropriate legal standard." Zhang, 859 F.Supp. at 713. The district court concluded that Chang, on which the IJ and the BIA relied, had been superseded by the January 1993 rule promulgated by then Attorney General Barr, that Zhang's application for asylum and withholding of return should have been assessed under the standard announced in the January 1993 rule, and that the IJ and the BIA had applied the wrong standard in determining whether or not Zhang had successfully entered the United States on June 6, 1993.
 
 
 50
 On appeal, the government contends that the district court erred in concluding (1) that the January 1993 rule issued by Attorney General Barr acted to overrule Chang, and (2) that the burden to establish that Zhang was free from official restraint rested with the government.
 
 
 51
 C. Previous Cases.
 
 
 52
 Zhang's primary argument--that fear of China's coercive "one child" policy may serve as a basis for refugee status--has been considered by more than a dozen federal courts. The majority of these courts have held that no act of the executive or legislature effectively overruled the BIA decision in Chang. See, e.g., Chen v. Carroll, 858 F.Supp. 569 (E.D.Va.1994), aff'd, 48 F.3d 1331 (4th Cir.1995); Chen v. Slattery, 862 F.Supp. 814 (E.D.N.Y.1994). Two other Circuits have addressed the apparent conflict between Chang and the various administrative actions. On the day that this appeal was argued before us, the Fifth Circuit issued a one-page per curiam summarily rejecting arguments made by applicants for asylum. See Zheng v. INS, 44 F.3d 379 (5th Cir.1995) (per curiam ). More recently, the Fourth Circuit considered and rejected arguments that Chang was overruled either by the January 1990 interim rule or by the March 1990 Executive Order. See Chen Zhou Chai v. Carroll, 48 F.3d 1331 (4th Cir.1995). The Fourth Circuit decision did not, however, address the effect of the January 1993 final rule, the administrative action upon which the district court in Zhang's case based its remand of the "one child" issue.
 
 
 53
 In addition to the district court's opinion in this case, one other federal district court has sided with the "Golden Venture" passengers on the "one child" issue. In Di v. Carroll, 842 F.Supp. 858, 866 (E.D.Va.1994), Judge Ellis found that, because of the conflicting policies advanced by the various members of the Reagan and Bush administrations, the BIA's decision in Chang is no longer entitled to the deference accorded administrative decisions. The Di court then conducted its own examination of the "one child" policy and found that fear of being subjected to the PRC's coercive family planning policy could serve as a basis for asylum. Id. at 871-74.
 
 
 54
 We now consider the government's claims that the district court erred in remanding Zhang's case to the BIA on both (A) the "one child" issue and (B) the "entry" issue.
 
 DISCUSSION
 
 55
 A. Refugee Status Based on China's "One Child" Policy.
 
 
 56
 In reviewing the district court's analysis of Zhang's claim for refugee status under China's "one child" policy, we first address the district court's finding that Chang, on which the BIA decision rests, has been overruled administratively. Our initial inquiry is therefore whether Chang is still good law. After finding that no administrative act served to displace Chang, we then consider whether Chang 's rejection of the "one child" policy as a basis for refugee status was consistent with immigration law.[6]
 
 
 57
 1. The Administrative Efforts to Overrule Chang.
 
 
 58
 In affirming the IJ's denial of Zhang's request for asylum and withholding of return, the BIA assumed that Chang was still good law. Such a finding is a conclusion of law and, as such, was properly reviewed de novo by the district court. The district court's conclusion reversing the BIA's finding is in turn reviewed de novo on appeal. See Sotelo-Aquije v. Slattery, 17 F.3d 33, 35 (2d Cir.1994).
 
 
 59
 Judge Patterson found that the January 1993 final rule signed by Attorney General Barr was effective and overruled Chang. See Zhang, 859 F.Supp. at 712-13. In considering the essentially identical claims advanced by Si, Judge Cedarbaum concluded that none of the actions of the various Bush administration officials disturbed Chang. Si, 864 F.Supp. 397. On appeal, Zhang has argued that the district court properly assessed the impact of the January 1993 final rule and, in the alternative, that various other acts of the Bush administration served to overrule Chang. We consider chronologically each of the administrative acts Zhang contends overruled Chang.
 
 
 60
 a. The January 1990 Interim Rule.
 
 
 61
 Zhang argues that the January 1990 interim rule, which directly contradicted Chang, went into effect in January 1990 and has never been expressly repealed. We conclude, however, that the January 1990 interim rule was never properly promulgated as a legislative rule under the Administrative Procedure Act ("APA") and that, even if it had been properly promulgated, it would have been repealed in June 1990 by the publication of subsequent regulations.
 
 
 62
 The APA empowers federal courts to "hold unlawful and set aside agency action, findings and conclusions found to be ... without observance of procedure required by law...." 5 U.S.C. Sec. 706(2). Generally, agency "rule[s]" must be subjected to a notice and comment period before taking effect.[7] 5 U.S.C. Sec. 553. Zhang offers no clear explanation as to how the January 1990 interim rule became effective absent notice and comment, but the briefs offered by amici and by Si rely on the several statutory exceptions to notice and comment provided by section 553. We review in detail three potentially applicable exceptions (foreign affairs, interpretive rulings, and good cause), keeping in mind the principle that exceptions to Sec. 553 should be "narrowly construed and only reluctantly countenanced." Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1236 (D.C.Cir.1994) (citation omitted). Finding none of these exceptions applicable here, we go on to conclude that the January 1990 interim rule would in any event have been repealed soon after when a final rule was adopted that made no allowance for victims of the PRC's "one child" policy.
 
 
 63
 Foreign Affairs. The notice and comment provisions of the APA are inapplicable to rules involving "a military or foreign affairs function of the United States," Sec. 553(a)(1), presumably to avoid the public airing of matters that might enflame or embarrass relations with other countries.
 
 
 64
 On occasion, courts have applied this exception to immigration rules. See, e.g., Nademi v. INS, 679 F.2d 811 (10th Cir.) (immigration policy changes affecting Iranian nationals enacted in response to the 1979-80 Iranian hostage crisis), cert. denied, 459 U.S. 872, 103 S.Ct. 161, 74 L.Ed.2d 134 (1982); Malek-Marzban v. INS, 653 F.2d 113 (4th Cir.1981) (same); Yassini v. Crosland, 618 F.2d 1356 (9th Cir.1980) (same). However, "[t]he foreign affairs exception would become distended if applied to INS actions generally, even though immigration matters typically implicate foreign affairs ... For the exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences." Yassini, 618 F.2d at 1360 n. 4 (citations omitted).
 
 
 65
 There are no "definitely undesirable international consequences" that would have resulted from following standard rule-making procedure in this case. In Jean v. Nelson, 711 F.2d 1455, 1477-78 (11th Cir.1983), vacated and rev'd on other grounds, 727 F.2d 957 (11 Cir.1984) (en banc ), aff'd, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), the Eleventh Circuit considered the applicability of the foreign affairs exception to regulations concerning the detention of thousands of Haitian refugees. The Justice Department adopted a policy of detaining aliens pending deportation proceedings, thereby altering the prior practice of releasing such persons into the population while their immigration proceedings were progressing. The government invoked the foreign affairs exception to justify its failure to subject that policy change to notice and comment. The Eleventh Circuit panel concluded that the government's argument would expand "that exception beyond the scope intended by Congress":
 
 
 66
 The government ... offered no evidence of undesirable international consequences that would result if rulemaking were employed. It argues only that the new policy touched on national sovereignty because, in the course of developing the policy, the President requested and received international cooperation. Certainly many issues with which the President deals involve national sovereignty; not all would have undesirable international consequences if rulemaking procedures were followed.... In light of Congress' intention that this exception receive limited application the district court correctly found the exception inapplicable.
 
 
 67
 Id. at 1477-78. The argument for the foreign affairs exception is even weaker in this case. There is no record evidence for the view that subjecting the January 1990 interim rule to notice and comment would have had any undesirable consequences. Compare Inter'l Bhd. of Teamsters v. Pena, 17 F.3d 1478, 1486 (D.C.Cir.1994) (exempting regulation allowing mutual recognition commercial driving licenses between U.S. and Mexico, because failure to achieve timely implementation would have violated an international agreement).
 
 
 68
 We are not in a good position to gauge the sensitivities of foreign nations, or to consider any but the most obvious foreign policy risks. Here, the weight of such concerns is not obvious, particularly since the focus of the interim rule--the overruling of Chang--had been at the center of a national debate for more than six months prior to the issuance of the rule. The Sec. 553(a)(1) exception does not apply.
 
 
 69
 Interpretive Rules. Under Sec. 553(b)(A), the notice and comment provisions do not apply "to interpretive rules [or to] general statements of policy." The distinction between legislative and interpretive rules is sometimes difficult to apply.[8] In distinguishing between the two types of rules, "the 'central question is essentially whether an agency is exercising its rule-making power to clarify an existing statute or regulation, or to create new law, rights, or duties.' " in what amounts to a legislative act. Mejia-Ruiz v. INS, 51 F.3d 358, 363 (2d Cir.1995) (citing White v. Shalala, 7 F.3d 296, 303 (2d Cir.1993)); see also Metropolitan Sch. Dist. of Wayne Township v. Davila, 969 F.2d 485, 488 (7th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1360, 122 L.Ed.2d 740 (1993). "Since legislative rule-making involves [an] agency's delegated power to make law through rules, it is subject to the public participation and debate that notice and comment procedures provide." White, 7 F.3d at 303-04. "Legislative rules have the force of law.... Interpretive rules, on the other hand, do not create rights...." New York City Employees' Retirement Sys. v. SEC, 45 F.3d 7, 11 (2d Cir.1995) (citations omitted). " 'A rule is interpretive ... if it attempts to clarify an existing rule but does not change existing law, policy, or practice.' " United States v. Yuzary, 55 F.3d 47, 51 (2d Cir.1995) (quoting Rocky Mountain Helicopters, Inc. v. Federal Aviation Admin., 971 F.2d 544, 546-47 (10th Cir.1992)).
 
 
 70
 The January 1990 interim rule is self-described as interpretive: "The Service has determined that notice and public comment regarding this interim final rule are unnecessary under 5 U.S.C. Sec. 553(b)(A) and (B). These changes constitute interpretive rules and general statements of policy." 55 Fed.Reg. 2803, 2804. However, we are not bound by such pronouncements: "the label that the particular agency puts upon its given exercise of administrative power is not ... conclusive; rather it is what the agency does in fact." Lewis-Mota v. Secretary of Labor, 469 F.2d 478, 481-82 (2d Cir.1972).
 
 
 71
 Chang holds that the "implementation of the 'one couple, one child' policy in and of itself, is [not] persecution [and does not] create[ ] a well-founded fear of persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion." Chang, 1989 WL 247513, 1989 BIA LEXIS 13, at * 12. By contrast, the January 1990 interim rule recites that "[a]liens who have a well-founded fear that they will be required ... to be sterilized because of their country's family planning policies may be granted asylum on the ground of persecution on account of political opinion." 55 Fed.Reg. 2803. The rule would allow refugee status to be conferred solely on the basis of an applicant's purported opposition to China's "one child" policy. It thus creates a new basis on which aliens may be granted refugee status; it changes an existing policy. We therefore conclude the January 1990 interim rule was legislative in character and could not have qualified for the interpretive exception to Sec. 553's notice and comment requirement. But see Chai, 48 F.3d at 1340-41 (finding that the January 1990 rule was a general statement of policy and therefore exempt from the APA's notice and comment requirement under the exception for interpretive rules).
 
 
 72
 Good Cause. Under Sec. 553(b)(B), notice and comment are unnecessary "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." The January 1990 interim rule states:
 
 
 73
 The interpretation will broaden the relief available to aliens and therefore will not harm any third parties. Notice and comment are also contrary to the public interest. The humanitarian goals underlying the Refugee Act will be best served by prompt codification in the rules of the Department's interpretation of the statute. The sooner the regulations are adopted, the sooner aliens will have published rules that will ensure the broadest possible protection of their rights.
 
 
 74
 55 Fed.Reg. at 2804-05.
 
 
 75
 "The legislative history of the Administrative Procedure Act demonstrates that Congress intended the exceptions in Sec. 553(b)(B) to be narrow ones." National Nutritional Foods Ass'n v. Kennedy, 572 F.2d 377, 384 (2d Cir.1978). Invocation of the "good cause" exception is therefore evaluated case by case. Alcaraz v. Block, 746 F.2d 593, 612 (9th Cir.1984). A mere recitation that good cause exists, coupled with a desire to provide immediate guidance, does not amount to good cause. Mobil Oil Corp. v. Dep't of Energy, 610 F.2d 796, 803 (Temp.Emer.Ct.App.), cert. denied, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1979). If "conclusory statement[s] that normal procedures were not followed because of the need to provide immediate guidance and information ... constituted 'good cause,' then an exception to the notice requirement would be created that would swallow the rule." Nader v. Sawhill, 514 F.2d 1064, 1068 (Temp.Emer.Ct.App.1975) (citations and internal quotations omitted). We have emphasized that the "good cause" exception, which by its terms operates only where notice and comment is "impracticable, unnecessary or contrary to the public interest," is not a catch-all:
 
 
 76
 The exemption of situations of emergency or necessity is not an "escape clause" in the sense that any agency has discretion to disregard its terms or the facts. A true and supported or supportable finding of necessity or emergency must be made and published. "Impracticable" means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings. "Unnecessary" means unnecessary so far as the public is concerned, as would be the case if a minor or merely technical amendment in which the public is not particularly interested were involved. "Public interest" supplements the term "impracticable" or "unnecessary"; it requires that public rule-making procedures shall not prevent an agency from operating and that, on the other hand, lack of public interest in rule making warrants an agency to dispense with public procedure.
 
 
 77
 National Nutritional Foods, 572 F.2d at 385 (citing S.Rep. No. 752, 79th Cong., 1st Sess. (1945)). It would not have been "impracticable" to subject the January 1990 interim rule to notice and comment; the resulting delay in promulgation would not have "prevented" the immigration services from functioning. Nor was notice and comment "unnecessary": the rule could hardly be classified as "a minor or merely technical amendment". The rule itself contains a largely conclusory statement that its immediate promulgation is necessary in order to benefit the greatest number of aliens. That is not enough. Presumably, agencies deem all their rules beneficial; the notice and comment requirement would be a dead letter if compliance could be excused whenever the beneficial effect would thereby be accelerated.
 
 
 78
 We conclude that the January 1990 interim rule was invalid without notice and comment, and that none of the Sec. 553 exceptions apply.[9] The rule therefore could not have acted to overturn Chang.
 
 
 79
 The July 1990 Repeal. Finally, even were we to find that the January 1990 interim rule was properly promulgated and therefore had the effect of overriding Chang, the rule was soon thereafter superseded by the final asylum regulations adopted in July 1990 which became effective on October 1, 1990. These final rules made changes in the regulations governing asylum and withholding of return claims, and significantly rewrote the same sections of the Code of Federal Regulations addressed by the January 1990 interim rule. No mention whatever was made of the 1990 interim rule. The January 1990 interim rule was never published in the annual codification of 8 C.F.R., a further sign that it was quietly repealed.
 
 
 80
 Zhang claims that this silent repeal of the January 1990 interim rule would itself have violated the notice and comment provisions of the APA. This argument is without merit. True, a "settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress.... [and that] an agency changing its course by rescinding a rule is obliged to supply a reasoned analysis for the change." Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 41-42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (emphasis added, citation and internal quotations omitted). The January 1990 rule--which was designated as "interim", was never applied, and was promptly ignored--cannot be deemed "settled". The January 1990 interim rule therefore failed to affect the validity of Chang.
 
 
 81
 b. The President's Executive Order.
 
 
 82
 Zhang argues that Chang was effectively overturned on April 11, 1990 by President Bush's Executive Order No. 12,711. In effect, the Executive Order required the Attorney General (and the Secretary of State) to take action to overrule Chang. Although the easiest and most direct way to do this would have been to follow through with rulemaking, the Attorney General did not promulgate a final rule until the last days of that Administration, nearly three years later.
 
 
 83
 "Generally, there is no private right of action to enforce obligations imposed on executive branch officials by executive orders." Facchiano Const. Co., v. United States Dept. of Labor, 987 F.2d 206, 210 (3d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 80, 126 L.Ed.2d 48 (1993); see also Haitian Refugee Ctr., Inc. v. Baker, 953 F.2d 1498, 1510-11 (11th Cir.), cert. denied, 502 U.S. 1122, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992); Michigan v. Thomas, 805 F.2d 176, 187 (6th Cir.1986). Only when executive orders have "specific foundation in Congressional action" are they "judicially enforceable in private civil suits." See In re Surface Mining Regulation Litig., 627 F.2d 1346, 1357 (D.C.Cir.1980). Executive Order 12,711 claims no specific Congressional authority, and has none.
 
 
 84
 The stated source of authority for the Executive Order was the President's general constitutional power to direct the administrative branch of government and the power of the Attorney General to determine whether to grant asylum or the withholding of return under the immigration laws. Indeed, the only arguable "specific foundation" for Congressional approval would have been the Emergency Chinese Immigration Relief Act. Yet, because of President Bush's veto--and Congress' failure to override it--this bill never became law. Zhang emphasizes that a number of Senators who voted to uphold the President's veto apparently did so after receiving assurances that the President would take administrative action to overrule Chang. See, e.g., 136 Cong.Rec. S379-80 (Jan. 23, 1990) (Statement of Sen. Grassley). This is an especially oblique form of legislative history. In any event, courts should be "reluctant to draw inferences from Congress' failure to act." Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 306, 108 S.Ct. 1145, 1154, 99 L.Ed.2d 316 (1988).
 
 
 85
 Furthermore, Executive Orders cannot be enforced privately unless they were intended by the executive to create a private right of action. Acevedo v. Nassau County, 500 F.2d 1078, 1083-84 (2d Cir.1974); Independent Meat Packers Ass'n v. Butz, 526 F.2d 228, 234 (8th Cir.1975), cert. denied, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). "[I]t has long been held that the executive branch may promulgate [directives] without creating rights and obligations enforceable by third parties." United States Dep't of Health & Human Servs. v. Federal Labor Relations Auth., 844 F.2d 1087, 1095 (4th Cir.1987) (in banc ). Nothing in President Bush's Executive Order indicated that the order was anything other than a directive issued to one of his cabinet officers. For whatever reasons, the Attorney General did not adhere to this order and the Bush Administration did not follow up on it. However, it is not the role of the federal courts to administer the executive branch.
 
 
 86
 Executive Order 12,711 did not act to overrule Chang.
 
 
 87
 c. The 1993 Final Rule.
 
 
 88
 The district court reversed the BIA on its reading of the January 1993 final rule.[10] Judge Patterson's opinion makes a cogent argument that the January 1993 final rule was successfully promulgated even though the rule was never published in the Federal Register. Nevertheless, on a ground not considered by Judge Patterson, we ultimately conclude that the January 1993 final rule also failed to overrule Chang.
 
 
 89
 Nonpublication in the Federal Register is a strong indication that a rule has not taken effect. Cf. United Technologies Corp. v. OSHA, 836 F.2d 52, 54 (2d Cir.1987) ("[T]he amendments ... were promulgated when they were published in the Federal Register."). We have ruled, however, that a regulation need not necessarily be published in order to be enforced against the government. The Freedom of Information Act mandates publication of agency Rules:
 
 
 90
 Each agency shall separately state and currently publish in the Federal Register for the guidance of the public ... (D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency.... Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published.
 
 
 91
 5 U.S.C. Sec. 552(a)(1) (emphasis added). This Court has held that "the requirement of publication [noted in the Freedom of Information Act] attaches only to matters which if not published would adversely affect a member of the public." New York v. Lyng, 829 F.2d 346, 354 (2d Cir.1987) (internal quotations omitted) (emphasis added). The January 1993 final rule is not one which "if not published would adversely affect a member of the public." Furthermore, we have noted (albeit in dicta ) that " '[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures....' even though the procedural requirement has not yet been published in the federal register." Montilla v. INS, 926 F.2d 162, 167 (2d Cir.1991) (quoting Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974)); see also Nguyen v. United States, 824 F.2d 697, 700 (9th Cir.1987) (an unpublished rule which should have been published pursuant to Sec. 552(a)(1) is effective unless it adversely affects a person's substantive rights); United States v. Aarons, 310 F.2d 341, 348 (2d Cir.1962) ("The only purpose of the requirement for publication in the Federal Register is to make sure that persons may find the necessary rules ... if they seek them.")
 
 
 92
 In order to be binding on anyone, however, it was necessary, first of all, that the rule become effective. The text of the January 1993 final rule, as signed by Attorney General Barr, contains the following indication (on page 2) as to when the rule will take effect: "EFFECTIVE DATE: [Insert date of publication in the FEDERAL REGISTER.]" JA at 1653. The rule, of course, was never published; the date was never filled in. This failure to publish was a deliberate step by an incoming Administration to terminate all open initiatives of the outgoing administration. By its own terms, the Rule never became effective.
 
 
 93
 In response, Zhang's reply brief cites National Resources Defense Council, Inc. v. EPA, 683 F.2d 752 (3d Cir.1982), for the view that the postponement of a rule's effective date requires either notice and comment, or an explanation as to why notice and comment is not needed. (The Clinton Administration, which prevented publication, offered neither.) Otherwise, as Zhang argues (quoting National Resources Defense Council, 683 F.2d at 762), "an agency could guide a future rule through the rulemaking process, promulgate a final rule, and then effectively repeal it, simply by indefinitely postponing its operative date. The APA specifically provides that the repeal of a rule is rulemaking subject to rulemaking procedures." However, this principle applies only to "promulgate[d] ... final rule[s]." Unlike the rule in National Resources Defense Council, the January 1993 "final rule" never became effective in the first place. Until the "EFFECTIVE DATE" was reached--by publication--there was no rule to repeal. The January 1993 rule did not act to overturn Chang.
 
 
 94
 We therefore conclude that none of the actions taken by the Bush Administration overturned Chang.
 
 
 95
 2. The Validity of Chang's Treatment of the "One Child" Rule.
 
 
 96
 We next consider whether the holding of Chang, that China's "one child" policy cannot in itself serve as the basis for a finding of refugee status, accords with immigration law.
 
 
 97
 a. The Proper Standard of Review.
 
 
 98
 Where Congress has spoken directly to a question, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Nothing in the immigration laws speaks directly to whether an alien may qualify as a refugee solely by virtue of being subjected to coercive family planning practices. Our review of the BIA's action is therefore limited to "whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2782; see also INS v. CardozaFonseca, 480 U.S. 421, 447-48, 107 S.Ct. 1207, 1221-22, 94 L.Ed.2d 434 (1987) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." (citations omitted)); Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072 (stating that an administrative agency is charged with "fill[ing] any gap left, implicitly or explicitly, by Congress"). We will only reverse "the BIA's interpretation of statutory law where 'it appears from the statute or its legislative history' that the interpretation is contrary to Congress's intent." Osorio v. INS, 18 F.3d 1017, 1022 (2d Cir.1994) (quoting Chevron, 467 U.S. at 845, 104 S.Ct. at 2783).
 
 
 99
 In general, while "[d]eference to [an] agency does not require us to abdicate the judicial duty carefully to review the record to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence," American Mining Congress v. EPA, 907 F.2d 1179, 1187 (D.C.Cir.1990) (internal quotations omitted), a "court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).
 
 
 100
 Not surprisingly, Zhang argues that in this case there has been no consistent policy to which we should defer. While "[a]n administrative agency is not disqualified from changing its mind," NLRB v. Local 103, Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers, 434 U.S. 335, 351, 98 S.Ct. 651, 660-61, 54 L.Ed.2d 586 (1978), "the consistency of an agency's position is a factor in assessing the weight that position is due." Good Samaritan Hosp. v. Shalala, --- U.S. ----, ----, 113 S.Ct. 2151, 2161, 124 L.Ed.2d 368 (1993). "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." Cardoza-Fonseca, 480 U.S. at 446 n. 30, 107 S.Ct. at 1221 n. 30 (citations and internal quotations omitted); see also Wilcox v. Ives, 864 F.2d 915, 924-25 (1st Cir.1988) (stating that "general admonitions for judicial review of agency decisions are even more exacting when the courts are faced with inconsistent agency positions"). The weight accorded the position of a wavering agency "will depend on the facts of individual cases." Good Samaritan Hosp., --- U.S. at ----, 113 S.Ct. at 2161 (deferring despite inconsistent agency positions).
 
 
 101
 Another court, reviewing the "one child" asylum claim of another "Golden Venture" passenger, described the various policies expressed by the President, the Attorneys General, the INS and the BIA over the past six years as "an administrative cacophony undeserving of judicial deference." Guo Chun Di v. Carroll, 842 F.Supp. 858, 867 (E.D.Va.1994) (Ellis, J.). In such a circumstance, Judge Ellis stated that deference "would be judicial abdication." Id. We do not agree, however, that the agency has forfeited its claim to judicial deference on this issue. The decision we review was issued by the BIA. The BIA is not a formal part of the INS, see Dor v. INS, 891 F.2d 997, 1002 n. 9 (2d Cir.1989), and is "separate from and independent of" that agency. Lee v. INS, 685 F.2d 343, 344 (9th Cir.1982) (per curiam ). The agency has repeatedly been on the verge of receiving a new policy; but throughout the BIA has followed its holding in Chang every time it has been asked to consider the PRC "one child" issue. We therefore conclude that deference is justified. Ultimately, Zhang's (and Judge Ellis') argument on the judicial deference standard hinges on the assumption that some act of the Bush Administration did in fact overrule Chang. This is the question we have considered in detail in this opinion.[11] As Judge Mukasey noted in another "Golden Venture" case:The policy consistently adhered to by the BIA and applied to aliens seeking asylum based on the "one child" rule is the policy articulated in Chang. Under the circumstances presented here, therefore, all that the various pronouncements [by the President and the Attorneys General] ... suggest is that the legislative and executive branches studiously abstained from overruling Chang.
 
 
 102
 Dong v. Slattery, 870 F.Supp. 53, 59 (S.D.N.Y.1994).
 
 
 103
 b. Chang Under the Deferential Standard.
 
 
 104
 Reviewing Chang with appropriate deference, it is difficult to question it. The ruling is consistent with the Supreme Court decision in INS v. Elias-Zacarias, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (decided after Chang ). Elias-Zacarias considered "whether a guerrilla organization's attempt to coerce a person into performing military service necessarily constitutes 'persecution on account of ... political opinion' under [8 U.S.C. Sec. 1101(a)(42) ]." Id. at 478, 112 S.Ct. at 814. The Court noted that the mere existence of a political motive underlying a persecutor's action is insufficient to establish a claim for asylum; the focus of the statute is on the victim's opinion (and whether the persecuted is visited by reason of that opinion). Id. at 482, 112 S.Ct. at 815-16. In rejecting the asylum claim before it, the Court found that the applicant had failed to demonstrate "that the guerrillas will persecute him because of [his] political opinion, rather because of his refusal to fight with them." Id. at 483, 112 S.Ct. at 816. Elias-Zacarias teaches that an applicant for refugee status must establish a fear of reprisal that is different in kind from a desire to avoid the exactions (however harsh) that a foreign government may place upon its citizens.
 
 
 105
 Here, China is carrying out a policy and apparently applying it generally to the residents of Zhang's province. Zhang feared the enforcement of a facially neutral Chinese law; he simply did not want it to be enforced against him. As Judge Mukasey recently noted in Dong:
 
 
 106
 It follows from the plain meaning of refugee under the Immigration Act, as set forth in Elias-Zacarias, that a PRC citizen prosecuted for opposition to a universally applied coercive family planning policy is not being persecuted for his political opinion. Under the "one child" policy, it is not the individual's political opinion or the expression thereof, but, rather, his past or likely future act that exposes him to punishment.
 
 
 107
 Dong, 870 F.Supp. at 58. Indeed, Chang itself acknowledges that, although the
 
 
 108
 implementation of the 'one couple, one child' policy in and of itself ... is [not] persecution [and does not] create[ ] a well-founded fear of persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion'[,] ... such a policy could ... be implemented in such a way as to individuals or categories of persons so as to be persecution on account of a group protected by the [Immigration] Act.
 
 
 109
 1989 WL 247513, 1989 BIA LEXIS, at * 12. This rule, embodying that distinction, is a reasonable interpretation of the immigration statutes.
 
 
 110
 Even were we to accept Judge Ellis' view that the "administrative cacophony" surrounding this issue justified diminished deference to Chang, our result would not change. It is difficult to frame a result different from the holding of Chang that would be "reasonable" under both Elias-Zacarias and the existing immigration laws.[12] No doubt, the President and the Congress acting together have power to create an exception to the existing immigration laws for PRC citizens, but it is doubtful that such an exception could be accomplished solely through administrative action. Zhang asks us to look at the steps taken by Congress, President Bush, the Attorneys General, and the General Counsel of the INS, and to connect the dots in order to implement a policy they all supported. We decline to exercise judicial power to repair or improve upon the incomplete initiatives of other government branches, particularly where the issue entails politically-charged issues with profound ramifications.
 
 
 111
 We therefore reject the district court's finding that administrative actions served to overrule Chang. The BIA properly analyzed (and rejected) Zhang's claim for refugee status based on his fear of being persecuted under China's "one child" policy.
 
 
 112
 B. Entry.
 
 
 113
 The BIA concluded that Zhang's arrival in the United States did not constitute an "entry". That conclusion should not have been disturbed by the district court. Zhang argues that he had completed the act of entering into the country prior to being taken into custody by the INS sometime around 3:00 or 4:00 a.m. on June 6, 1993. Accordingly, he argues that he is subject to deportation rather than the more summary exclusion proceedings.
 
 
 114
 As compared with exclusion, deportation proceedings offer an alien important advantages: the burden of proof is placed on the government; and the alien has the right to receive advance notice of charges, to take a direct appeal to the Federal Court of Appeals, to seek suspension of the order and to designate the country of destination. Correa v. Thornburgh, 901 F.2d 1166, 1171 n. 5 (2d Cir.1990). By contrast, "[o]ther than protection against physical abuse, the alien seeking initial entry appears to have little or no constitutional due process protection." Id.
 
 
 115
 "[W]e must uphold the BIA's or the IJ's factual findings regarding ... eligibility for asylum ..., or withholding of deportation ..., if they are reasonably supported by substantial evidence on the record." Osorio, 18 F.3d at 1022 (emphasis omitted). A petitioner seeking a reversal of a BIA factual determination must, therefore, show "that the evidence he presented was so compelling that no reasonable factfinder could fail" to agree with these factual findings. Elias-Zacarias, 502 U.S. at 483-84, 112 S.Ct. at 816-17. Under 8 U.S.C. Sec. 1101(a)(13), "entry" is defined as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntary or otherwise...." Nevertheless, mere presence in the United States has never been sufficient to constitute "entry". See Leng May Ma v. Barber, 357 U.S. 185, 188, 78 S.Ct. 1072, 1074, 2 L.Ed.2d 1246 (1958). In Correa, we cited with approval a more particular definition of entry as formulated by the BIA in Matter of Pierre, Int.Dec. 3215, 1973 WL 29484 (BIA 1973):
 
 
 116
 An entry involves: (1) a crossing into the territorial limits of the United States, i.e. physical presence; (2)(a) an inspection and admission by an immigration officer or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.
 
 
 117
 Correa, 901 F.2d at 1171. We conclude that in remanding the "entry" issue to the BIA, the district court failed to properly apply this Pierre test.
 
 
 118
 1. Facts Bearing on Entry. The United States Coast Guard tracked the "Golden Venture" off the East coast of the United States during the night of June 5-6, 1993. See Matter of G--, Int. Dec. 3215, 1973 WL 29484, 1993 BIA LEXIS 14 (BIA Dec. 8, 1993) (describing factual circumstances surrounding the grounding of the "Golden Venture"). However, by the time vessels were sent to intercept it, the smuggling ship could no longer be found. The ship ran aground on a sandbar some 100 to 200 yards off the coast of the Rockaway Peninsula in the Gateway National Recreation area of Queens, New York. At approximately 1:45 a.m. two officers of the Department of the Interior Park Police, on a routine patrol through Gateway Park, spotted the stranded ship as well as some of its passengers running on the nearby beach and swimming in the water. At 1:58 a.m. the Park Police placed an emergency call to the New York City Police Department. The first New York City police officers arrived on the beach at 2:19 a.m. They were joined by law enforcement personnel from other agencies, including the Jacob Riis Park Police and the Coast Guard. INS officials did not arrive at the scene until approximately 3:30 a.m.
 
 
 119
 In an effort to prevent passengers who reached shore from leaving the area, the law enforcement agencies quickly cordoned off a one-quarter to one-half mile section of beach extending 600 yards inland from the shore-line. Roughly 200 of the 300 "Golden Venture" passengers attempted to reach shore by jumping off the stranded ship or by climbing down the ship's ladders into the ocean. Most were plucked from the water by rescue personnel or apprehended upon reaching the beach. A few, however, were able to reach the surrounding neighborhood. By the evening of June 6, all but 30 of the "Golden Venture" passengers had been captured by federal and state officials.
 
 
 120
 In an affidavit submitted to the IJ, Zhang recounted his journey from China to INS detention:
 
 
 121
 I left China on February 13, 1993 at around 10 o'clock at night. I boarded a motorboat and was brought to a larger ship. A day later I was transferred to the boat on which I travelled to America. I understand that this ship is called the Golden Venture. I remained on the Golden Venture until my arrival in the United States on the night of June 5, morning of June 6.
 
 
 122
 I knew that I was being transported to the United States as part of a smuggling operation, and that I would not be entering the United States by lawful means. I did not know the details about how to enter the United States lawfully. I did not expect to get arrested when I arrived in the United States. All I know is that I would travel to the United States by boat. The 'snakeheads' told me that they would arrange for people to come and pick us up on the boat. I did not know where we would be picked up or how we would be picked up. I was also told that if we were not picked up we would have to look after ourselves and make our own way into the United States.
 
 
 123
 While we were travelling at approximately 1:00 a.m. on the morning of June 6 the boat suddenly shook violently. Someone shouted that "we are in America". Everyone ran up on deck. We were very close to land--maybe no more than 100 meters. Word spread among the passengers that the best thing to do was to jump into the water and swim to the shore. We then went back into the hold of the ship and collected our belongings, which we wrapped up in bags and tied around our waists. When I went back up on deck there were helicopters with floodlights flying over the Golden Venture and rescue boats in the water.
 
 
 124
 I entered the sea by climbing down a ship ladder instead of jumping straight into the water. The water was freezing cold. After I swam about 10 meters my feet could touch a sandbar. The waves pulled me away from the sandbar and I went out of my depth. Many of us began to panic--I think this is why some people drown. At this stage the police rescue boats were fishing people out of the water. Without the police I believe many more people--perhaps as many as 40 to 50--could have died. I swam the whole way to the shore. Even though the shore was not very far away it was very difficult to make progress because the waves kept throwing me backwards. I have no idea how long it took me to reach the shore.
 
 
 125
 When I stepped foot on the beach I was utterly exhausted. My legs were in extreme pain and I felt paralysed. I thought of trying to leave the beach but I did not have the strength to do so. I walked a few steps and then collapsed to the ground. There were some policemen a short distance away from me on the beach. The police came over, wrapped me in a blanket, picked me up off the ground and carried me off the beach. I was placed on the ground besides a bus and remained there for about an hour. During that time I watched the police help other passengers who had swum from ship to shore.
 
 
 126
 I was then placed in the bus and taken to the Red Cross where I was given a physical examination and questioned about my medical condition. From there I was transferred to the INS Detention Center on Varick Street. Shortly after my arrival at the Varick Street detention center, I was taken to another building where my fingerprints were taken. The next day I returned to the Varick Street detention center where I have remained ever since.
 
 
 127
 JA at 1196-99 (numbering of paragraphs eliminated). Zhang's formal exclusion proceedings began on June 30, 1993 before the IJ.
 
 
 128
 2. Principles Bearing Upon Entry.
 
 
 129
 Correa and Pierre state that persons who do not submit themselves for inspection by immigration officers "enter" the United States only if they are free from official restraint when they achieve physical presence in the United States through an actual and intentional evasion of detection and capture by officers at the nearest inspection point. Correa, 901 F.2d 1166, 1171.
 
 
 130
 a. Physical Presence. The district court concluded that Zhang had satisfied the "physical presence" requirement for entry, by coming within the twelve-mile territorial limit of the United States coastline. Zhang, 859 F.Supp. at 713-14. The court pointed to 8 C.F.R. Sec. 287.1(a)(1), which defines the "external boundar[ies]" of the United States as "the land boundaries and the territorial sea of the United States extending 12 nautical miles from the baseline of the United States...." The district court's reliance on this section of the CFR is not consistent with Correa 's interpretation of the "physical presence" aspect of the Pierre test. In Correa, the alien arrived in the United States aboard a commercial flight from Guatemala. The Correa court rejected the notion that the alien was "physically present" for purposes of entry at the moment her airplane crossed into United States airspace or even when it landed on the ground of the Houston airport. The Correa court noted that the alien "satisfied the first prong, 'physical presence,' when she disembarked her Avianca flight from Guatemala to Houston." Correa, 901 F.2d at 1171. Under that interpretation, the earliest Zhang satisfied Pierre 's "physical presence" prong was when he disembarked from the "Golden Venture" into the Rockaway waters.
 
 
 131
 However, United States immigration law is designed to regulate the travel of human beings, whose habitat is land, not the comings and goings of fish or birds. We hold that an alien attempting to enter the United States by sea has not satisfied the physical presence element of Pierre at least until he has landed. Zhang, therefore, was not physically present until he came to the beach. But see Lazarescu v. United States, 199 F.2d 898, 900-01 (4th Cir.1952) ("The port and harbor of Baltimore is territory of the United States. Entry into that territory even in a vessel amounted to [entry] unless [the alien] was under restraint which prevented his departing from the vessel.").
 
 
 132
 b. Evasion and Freedom From Restraint. Since Zhang did not undergo "an inspection and admission by an immigration officer," we must determine whether he "actual[ly] and intentional[ly] eva[ded] ... inspection at the nearest inspection point ... [while he was] free[ ] from official restraint." The "inspection point[s]" that Pierre requires an alien to evade in order to enter the United States are land-based offices located at airports, harbors and roadsides. Therefore, Zhang's evasion of INS inspection points can hardly have been accomplished while he was still at sea. In Zhang's case, the question of whether he "actual[ly] ... eva[ded] ... inspection" hinges on the question of whether he made it to the Rockaway beach "free[ ] from official restraint".
 
 
 133
 We are aware that "even a temporary evasion of the inspection process suffices to produce an entry." United States v. Kavazanjian, 623 F.2d 730, 739 n. 19 (1st Cir.1980). Nevertheless, while Zhang clearly "inten[ded]" to evade inspection, he did not "actually" do so because he was kept under "official restraint" from the moment he set foot in the United States. In Correa, we noted that " '[f]reedom from official restraint' means that an alien who is attempting entry is no longer under constraint emanating from the government that would otherwise prevent her from physically passing on." Correa, 901 F.2d at 1172. According to Zhang's account, as soon as he landed on the beach, "[t]he police came over, wrapped me in a blanket, picked me up off the ground and carried me off the beach." It does not matter that this initial detention was undertaken by the Park Police and agents of local law enforcement organizations. "Such restraint need not be by immigration officers." Correa, 901 F.2d at 1172 (citing Edmond v. Nelson, 575 F.Supp. 532, 535 (E.D.La.1983) (restraint by ship's master)). What matters under the immigration law is what matters to the alien seeking to avoid it: Zhang was never (in words of Correa ) "free to physically enter the United States or to go at large and mix with the general population." Correa, 901 F.2d at 1172.
 
 
 134
 This case is distinguishable from our previous decision in Cheng v. INS, 534 F.2d 1018 (2d Cir.1976) (per curiam ). In Cheng, aliens hiding in a van surreptitiously crossed the Canadian border into Vermont a short distance from an INS border patrol. Id. at 1019. The van was not detected until it had proceeded four-tenths of a mile over the border, and was stopped another mile into the country. Zhang, by contrast, was apprehended when he came onto the beach, shipwrecked, so that he arrived and was rescued and arrested at the same time.
 
 
 135
 Although we conclude that Zhang was not physically present until he arrived on the beach, his entry claim would fail even if he was deemed physically present in the United States when he went from the stranded ship into the water. Zhang was already under the surveillance of the local law enforcement agencies by the time he left the "Golden Venture". In his brief on appeal, Zhang argues that he "manifested his freedom from restraint after the Golden Venture had been run aground, by leaving the vessel to swim to shore." Once the ship was spotted off the Rockaway coast, however, the passengers aboard it were already under restraint, a point demonstrated by the prompt arrest of Zhang and many others who abandoned the vessel. "Continuous surveillance by immigration authorities can be sufficient to place an alien under official restraint." United States v. Aguilar, 883 F.2d 662, 681 (9th Cir.1989), cert. denied, 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991). As he stated in his affidavit submitted to the IJ: "When I went ... up on deck [of the 'Golden Venture'] there were helicopters with floodlights flying over the Golden Venture and rescue boats in the water." By the time he entered the water, Zhang realized that there were "police rescue boats ... fishing people out of the water." Since it is uncontested that there was sufficient police presence to save some of the passengers from drowning, and to arrest others who reached the beach, Zhang was already within the reach of the law enforcement agencies when he left the "Golden Venture".
 
 
 136
 c. Burden of Proof. The district court remanded Zhang's case to the BIA on the entry issue primarily on the ground that "[t]he BIA erred in placing the burden of proof on Petitioner." Zhang, 859 F.Supp. at 714. Adopting the view expressed in Application of Phelisna, 551 F.Supp. 960, 963 (E.D.N.Y.1982), the district court reasoned that the burden of proof should rest with the government, because the government is in a better position to prove restraint than is the typical alien. Zhang, 859 F.Supp. at 714. This reading of the immigration act is contrary to the reading repeatedly given by the BIA on this issue. See, e.g., Matter of G--, 1993 WL 29484, 1993 BIA LEXIS 14. As we have already noted, we will only reverse "the BIA's interpretation of statutory law where 'it appears from the statute or its legislative history' that the interpretation is contrary to Congress's intent." Osorio, 18 F.3d at 1022 (quoting Chevron, 467 U.S. at 845, 104 S.Ct. at 2783).
 
 
 137
 In support of its argument on the burden of proof issue, the government points to 8 U.S.C. Sec. 1361, which states in pertinent part:
 
 
 138
 Whenever any person ... makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he is ... not subject to exclusion under any provision of this chapter .... [N]or shall such person be admitted to the United States unless he establishes to the satisfaction of the Attorney General that he is not subject to exclusion....
 
 
 139
 (Emphasis added.) In Phelisna--a case decided prior to Chevron--Judge Nickerson concluded that the text of section 1361 did not resolve the burden of proof question:
 
 
 140
 The government asserts that petitioner was "obviously a person 'attempt[ing] to enter the United States.' " But that simply begs the question. The issue is whether "entry" was accomplished. One who is attempting to enter has by hypothesis not yet entered and must show he is entitled to do so. But one who has entered is no longer attempting to do so.
 
 
 141
 Phelisna, 551 F.Supp. at 963. In the absence of an "express statutory provision allocating the burden of proving 'entry,' " Judge Nickerson reasoned that, because "[t]he government is ordinarily more likely to have ready access to th[e relevant] evidence than the alien," the burden of proof properly rests with the government. Id. at 963-64. We agree with Judge Nickerson's finding that there is "no express statutory provision allocating the burden of proving 'entry' ". Id. at 963. Under the intervening principles of Chevron, however, we must defer to any reasonable BIA interpretation of an ambiguous immigration statute. We conclude that it is not an unreasonable interpretation of Sec. 1101(a)(13) and the related statutes to place upon an alien the burden of proving entry. Accordingly, the BIA's ruling on the entry issue should not be disturbed.
 
 CONCLUSION
 
 142
 For the foregoing reasons, we reverse the judgment of the district court and remand with instructions to dismiss the petition for a writ of habeas corpus.
 
 
 
 *
 Honorable James L. Oakes, Senior Circuit Judge, who was originally assigned to be a member of the panel, did not participate in the consideration of this case. The matter was submitted to and decided solely by Judges Miner and Jacobs. See Murray v. National Broadcasting Co., Inc., 35 F.3d 45 (2d Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 734, 130 L.Ed.2d 637 (1995)
 
 
 [1]
 The proposed Act provided in pertinent part:
 Sec. 3 STANDARDS TO BE APPLIED IN ADJUDICATING APPLICATIONS FOR ASYLUM, WITHHOLDING OF DEPORTATION, AND REFUGEE STATUS FROM CHINESE FLEEING COERCIVE POPULATION CONTROL POLICIES.
 (a) IN GENERAL.--With respect to the adjudication of all applications for asylum, withholding of deportation, or refugee status from nationals of China filed before, on, or after the date of the enactment of this Act, careful consideration shall be given to such an applicant who expresses a fear of persecution upon return to China related to China's "one couple, one child" family planning policy. If the applicant establishes that such applicant has refused to abort or be sterilized, such applicant shall be considered to have established a well-founded fear of persecution, if returned to China, on the basis of political opinion consistent with paragraph (42)(A) of section 101(a) of the Immigration and Nationality Act (8 U.S.C. § 1101(a)).
 Chen Zhou Chai v. Carroll, 48 F.3d 1331, 1336 n. 3 (4th Cir.1995) (citing Emergency Chinese Immigration Relief Act of 1989, Sec. 3(a), H.R. 2712, 101st Cong., 1st Sess. (1989)).
 
 
 [2]
 The following summary is drawn from the proceedings conducted before the IJ in the summer of 1993
 
 
 [3]
 Zhang's story parallels the following account presented to this court by Peng-Fei Si, the "Golden Venture" passenger whose appeal was also pending before this panel prior to its withdrawal
 Si was born in 1967 in Tianjiang, Fuzhou City, in China's Fujian Province. He remained in Fujian Province until his covert departure to the United States in April 1992.
 Si married Yue Zhu Lin in 1990 and the two had a son, Quan Wei Si, in early 1991. Shortly after Quan Wei's birth, local government officials began to pressure Si and his wife to take measures to prevent conception of more children. Because her medical condition apparently precluded Si's wife from undergoing a sterilization procedure, the official asked that Si be sterilized. Si refused but pledged not to have any more children. The local officials returned to Si's home in June 1991 and again demanded that Si be sterilized. Si told the officials that his wife was too sick to become pregnant soon. He also claimed that he could not take any time off from his work in order to undergo the operation. The local officials appeared at Si's home for a third time in November 1991 and threatened to arrest him if he was not sterilized. He ultimately agreed to the procedure but convinced the officials to temporarily postpone the operation by giving them a "deposit" of 20,000 renminbi (roughly $3,000).
 In February 1992, after hearing rumors through a friend that the officials were about to demand that he undergo an immediate sterilization, Si fled. At first he hid at his Aunt's house. Eventually, with the help of his father, he arranged a payment of roughly $13,000 to be smuggled to the United States. In early 1993 he boarded the "Golden Venture" for the voyage which ended off the shores of Rockaway.
 
 
 [4]
 China's family planning program apparently presumes that people have children only with their spouses
 
 
 [5]
 Some of the "Golden Venture" passengers were apprehended while still on the ship while others made it across the beach into Queens. Some eight to ten passengers died
 
 
 [6]
 On appeal, Zhang presents no argument that his claim for asylum should have prevailed even if Chang accurately states the law regarding the PRC's coercive family planning program. We therefore are not required to consider the BIA's application of Chang to Zhang's specific factual claim
 
 
 [7]
 The APA defines a rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy...." 5 U.S.C. Sec. 551(4). The January 1990 interim rule clearly fits this definition
 
 
 [8]
 In an effort to clarify the inquiry, we have recently followed the lead of the Seventh Circuit, see Metropolitan Sch. Dist. of Wayne Township v. Davila, 969 F.2d 485, 488 (7th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1360, 122 L.Ed.2d 740 (1993), and replaced the "substantive/interpretive" expression of this dichotomy with the more helpful "legislative /interpretive." See White v. Shalala, 7 F.3d 296, 303 (2d Cir.1993)
 
 
 [9]
 Section 553(a)(2) also provides for an exception to notice and comment for "matter[s] relating to agency management or personnel or to public property, loans, grants, benefits or contracts." Clearly the January 1990 interim rule does not come within this narrow exception
 
 
 [10]
 On appeal, the government argues that the district court erred in even considering the effect of the January 1993 final rule because Zhang failed to raise a claim concerning this rule before the BIA. While it is true that matters not presented to the BIA cannot be considered by a reviewing federal court, see Augustin v. Sava, 735 F.2d 32, 36 & n. 10 (2d Cir.1984), we agree with the district court that Zhang did adequately raise this issue before the BIA. As the district court noted, Zhang "included in his brief to the BIA a thorough discussion of the effectiveness of an interim regulation published in 1990 on which the January 1993 Rule was based, and [Zhang] noted that the Attorney General finalized the interim regulation in January 1993." 859 F.Supp. at 712 n. 3. We therefore consider the merits of the district court's analysis of the effect of the January 1993 final rule
 
 
 [11]
 Judge Ellis constructed the following chart, a timeline of the actions taken during the Reagan, Bush and Clinton Administrations in regard to the "one child" policy. We reproduce that chart below, emphasizing the actions of the BIA:
 Pronouncement Asylum Eligibility
1. August 5, 1988 Guidelines promulgated by then asylum permitted
 Attorney General Edwin Meese
2. Matter of Chang, Int.Dec. 3107 (BIA May, 1989) asylum not permitted
3. January, 1990 Interim Rule promulgated asylum permitted
 Pronouncement Asylum Eligibility
 by then Attorney General Richard Thornburgh
4. Executive Order No. 12,711, 55 Fed.Reg. 13, 897 asylum permitted
 (1990) issued by President George Bush
5. July, 1990 Rule asylum not addressed
6. November, 1991 Memorandum from the General determining that PRC's
 Counsel of the I.N.S. coercive family
 planning practices
 constitute persecution
 on account of political
 opinion
7. January 1993 Rule promulgated by then Attorney asylum permitted
 General William Barr
8. Matter of Chu, Agx-ogu-ajg (BIA June 7, 1993), asylum not permitted
 Matter of Tsun, Asl-ioi-yco (BIA June 7,
 1993), and Matter of G--, Alv-zll-wbj (BIA
 Dec. 8, 1993)
9. December 7, 1993 pronouncement by Attorney declined to address
 General Janet Reno conflicting views in
 Chang and Executive
 Order 12,711
 Di, 842 F.Supp. at 866-67 (emphasis added). Only two entries on Judge Ellis' chart pertain to the BIA; both reflect decisions consistent with the government's position in this case.
 
 
 [12]
 In response to questioning at oral argument, the government declined to offer a view as to whether the January 1993 final rule would have been a permissible interpretation of the immigration laws had it been duly promulgated